# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LISA M. KINCAID,<br><br>          *Plaintiff*,<br><br>     v.<br><br>WILLIAM P. BARR, *et al.*,[1]<br><br>          *Defendants*. | Civil Action No. 17-1941 (RDM)<br><br>**FILED UNDER SEAL** |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa M. Kincaid, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") filed a four-count complaint against the Attorney General of the United States and the Acting Director of the ATF, alleging that the ATF violated Title VII by discriminating against her on the basis of her sex and by retaliating against her for engaging in activity protected under Title VII.  Defendants move to dismiss Counts I and II, which allege unlawful retaliation, for failure to state a claim and move to dismiss all claims against the Acting Director of the ATF on the ground that only the agency head, here the Attorney General, is a proper defendant in a Title VII case.

For the reasons discussed below, the Court will deny Defendants' motion to dismiss Counts I and II but will grant their motion to dismiss all claims against the Acting Director of the ATF.

---

[1]  William P. Barr is automatically substituted for Jefferson B. Sessions, III pursuant to Fed. R. Civ. P. 25(d).

# I.  BACKGROUND

For purposes of the pending motion to dismiss, the following facts, which are taken from Kincaid's second amended complaint, Dkt. 44-2, are accepted as true.  *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *see also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice.").

## A.    Factual Background

### 1.    *Initiation of Wright Investigation*

Kincaid is a GS-14 Special Agent employed by the ATF.  Dkt. 44-2 at 6 (2d Am. Compl. ¶ 19).  Prior to the events giving rise to this case, Kincaid served as a criminal investigator in the ATF's Internal Affairs Division ("IAD"), a component of the ATF's Office of Professional Responsibility and Security Operations.  *Id.*  In that capacity, Kincaid was responsible for investigating allegations of employee misconduct, which could include "employee corruption such as bribery or embezzlement, civil rights abuses, violence, ethics violations, and prohibited personnel practices." *Id.* at 7 (2d Am. Compl. ¶ 25).  Her "career with the ATF has been highlighted with many outstanding ratings, performance awards, and promotions."  *Id.* (2d Am. Compl. ¶ 21).

On July 12, 2013, Kincaid was assigned to conduct a preliminary IAD investigation into allegations that then-Deputy Chief of the ATF's Special Operations Division, Billy Wright, had discriminated against and harassed ATF Special Agent SherryAnn Quindley.  *Id.* at 8–9 (2d Am. Compl. ¶ 29–32).  Kincaid's investigation corroborated Special Agent Quindley's allegations and revealed "credible allegations" that Deputy Chief Wright "had engaged in sex discrimination

and other misconduct in addition to what had been reported by Special Agent Quindley." *Id.* at 9 (2d Am. Compl. ¶¶ 34–35). Her investigation also turned up "numerous credible allegations of misconduct, including Title VII violations," against the Chief of the ATF's Special Operations Division, Charles Smith. *Id.* at 9–10 (2d Am. Compl. ¶ 34–36); *id.* at 1 (2d Am. Compl. ¶ 2).

After completing initial interviews and the gathering of evidence in September 2013, Kincaid briefed her supervisors within IAD, Assistant Special Agent in Charge ("ASAC") Daniel Machonis and Special Agent in Charge ("SAC") Thomas Chittum, on her findings. *Id.* at 11 (2d Am. Compl. ¶ 37). At this point, Kincaid alleges, "ATF management . . . including . . . SAC Chittum, actively interfered with [her] ability to complete the [p]reliminary [i]nvestigation in a timely manner, and intentionally delayed converting it into a full IAD investigation." *Id.* (2d Am. Compl. ¶ 38). In October 2013, for example, SAC Chittum directed Kincaid to investigate a different ATF employee, to "make [that other investigation] her top priority," and thereby "forced [her] to set aside the Wright investigation for five months." *Id.* at (2d Am. Compl. ¶ 39).

Kincaid "resumed the Wright investigation in the spring of 2014," at which point "SAC Chittum actively disparaged [Special Agent] Quindley's allegations and those of the other women . . . Kincaid interviewed, and dismissively claimed that . . . Wright's actions did not violate Title VII." *Id.* (2d Am. Compl. ¶ 40). Kincaid "expressly objected to SAC Chittum's mischaracterization of these Title VII allegations" and "informed SAC Chittum repeatedly that if [Special Agent] Quindley's case ever went to court, [Kincaid] would truthfully testify to everything she had learned in the course of her preliminary investigation about . . . Wright's and . . . Smith's violations of Title VII." *Id.* at 11–12 (2d Am. Compl. ¶ 40).

2.     *Submission of Preliminary Report*

By August 7, 2014, Kincaid completed and submitted to her supervisors, ASAC Machonis and SAC Chittum, a 272-page preliminary report detailing the findings of her investigation.  *Id.* at 12 (2d Am. Compl. ¶ 41).  The report "encompassed and documented" Kincaid's investigation of Special Agent Quindley's original allegations, "additional instances of sex discrimination, sexual harassment, and other allegations of wrongdoing against" Wright, and "allegations of wrongdoing against . . . Smith and other management officials and the failure to remedy" those violations.  *Id.* at 12 (2d Am. Compl. ¶ 42).  After reviewing the report, ASAC Machonis told Kincaid "that he believed it was extremely thorough and that she had documented numerous instances from multiple sources that warranted further investigation."  *Id.* (2d Am. Compl. ¶ 43).  The report was given to SAC Chittum and forwarded to senior IAD management with ASAC Machonis's recommendation that a full investigation be initiated.  *Id.* (2d Am. Compl. ¶ 43).

Kincaid alleges that SAC Chittum nonetheless declined to open a full investigation after reviewing her preliminary report.  *Id.* at 13 (2d Am. Compl. ¶ 45).  She alleges that SAC Chittum incorrectly "claimed that . . . Quindley's allegations did not warrant further investigation by IAD because they were already being investigated in the context of" Quindley's parallel EEO complaint.  *Id.*  Kincaid "objected, informing SAC Chittum that . . . Quindley's EEO investigation did not cover everything that was addressed by [Kincaid's] preliminary investigation" and did nothing to address "the allegations raised by numerous other women that . . . Wright and . . . Smith had violated Title VII," which Kincaid had also "uncovered during the course of her preliminary investigation."  *Id.*

3.      *Failure to Hire for ASAC Job within IAD*

On August 28, 2014, three weeks after Kincaid turned in her preliminary report for review, a vacancy for a GS-15 ASAC position in IAD was announced.  *Id.* at 14 (2d Am. Compl. ¶ 48).  Kincaid timely applied, she was notified that she had been placed on the "Best Qualified" list, and she was interviewed on September 22, 2014 by a panel that included SAC Chittum.  *Id.* (2d Am. Compl. ¶¶ 49–50).  Later that day, SAC Chittum advised Kincaid that she had not been selected for the ASAC position and that a male Special Agent was selected instead.  *Id.* (2d Am. Compl. ¶ 51).  Plaintiff alleges that she "was considerably more qualified" than the male agent selected for the position—she had "better and greater experience"—and "two members of the interview panel" confirmed that "her written submissions and interview were both much stronger than his."  *Id.* (2d Am. Compl. ¶ 52).

4.      *Follow-up on Preliminary Report*

On October 3, 2014, SAC Chittum instructed Kincaid "to break out each of the additional allegations of wrongdoing" in her preliminary report into distinct incident reports that would be investigated separately.  *Id.* at 15 (2d Am. Compl. ¶ 55).  Kincaid alleges that this "prevented the allegations against . . . Smith and . . . Wright that she had reported . . . from being converted to a full IAD investigation or referred to" the Office of the Inspector General "collectively," and that separating the incidents addressed in her report "downplayed the pervasiveness of the allegations" by treating them "in isolation rather than as an integrated whole."  *Id.* (2d Am. Compl. ¶ 56).  She continued her investigation into some of these distinct allegations of Wright's and Smith's alleged misconduct until the end of her service with IAD.  *Id.* at 16–17 (2d Am. Compl. ¶¶ 62–65).  The Department of Justice's Office of the Inspector General ("OIG"), which received a referral regarding only a portion of the allegations addressed in Kincaid's preliminary

report, eventually initiated a full investigation into one of the non-Title VII allegations against Smith—a claim that he had gambled while on duty.  *Id.* at 15–16 (2d Am. Compl. ¶ 57–58).  In November 2014, SAC Chittum was reassigned to a different position and was replaced by SAC Thomas Murray.  *Id.* at 16 (2d Am. Compl. ¶ 59).

5.     *Initiation of Informal EEO Complaint*

On November 20, 2014, Kincaid began the informal administrative EEO complaint process challenging her non-selection for the ASAC position in the IAD.  *Id.* at 14 (2d Am. Compl. ¶ 53).  She alleged "that she had been discriminated against because of her sex and retaliated against for her protected EEO activities in conducting the investigation into . . . Wright and . . . Smith."  *Id.*  "She named her husband as her representative . . . in the EEO process," which was "permissible."  *Id.* at 14–15 (2d Am. Compl. ¶ 53).  In January 2015, however, "Kincaid decided not to pursue the formal EEO complaints process," fearing "that she would be subjected to retaliation."  *Id.* at 15 (2d Am. Compl. ¶ 54).

6.     *Reassignment of Initial Investigation*

When the IAD finally converted Kincaid's initial inquiry into Wright's alleged sexual misconduct into a full internal investigation on May 15, 2015, Kincaid's supervisor "promptly reassigned" the matter "to a male agent."  *Id.* at 16 (2d Am. Compl. ¶ 61).  Kincaid informed her supervisors that she "object[ed] to this reassignment."  *Id.*  She alleges that the ATF "later attempted to justify reassigning the Wright investigation away from [her] by claiming that [Kincaid's investigation] lacked objectivity and was not thorough."  *Id.*  Kincaid alleges, however, that her "performance was rated 'Outstanding' during the appraisal period covering her work on the preliminary investigation."  *Id.*

6

7.      *Failure to Hire for South Carolina RAC Position*

On November 4, 2015, Kincaid informed SAC Murray that she was interested in applying for an open position as the Resident Agent in Charge ("RAC") in the agency's Columbia, South Carolina field office.  *Id.* at 19 (2d Am. Compl. ¶¶ 70, 72).  Kincaid had previously held the same position at the ATF's Pensacola, Florida field office.  *Id.* (2d Am. Compl. ¶ 71).  Murray told Kincaid that he would support her candidacy.  *Id.* (2d Am. Compl. ¶ 72).  She applied on November 9.  *Id.* at 20 (2d Am. Compl. ¶ 74).

The selecting official for the position, SAC Christopher Hyman, was "a long time professional associate of . . . Smith."  *Id.* (2d Am. Compl. ¶ 75).  Kincaid alleges that, "[b]y that time, it was well-known that . . . Smith was under investigation and that . . . Kincaid had been deeply involved in investigating him."  *Id.*  Because she was already a GS-14, Kincaid was eligible for a lateral transfer to the RAC position without having to compete for it.  *Id.* (2d Am. Compl. ¶ 73).  Kincaid alleges that, after learning that Kincaid sought the position, SAC Hyman "decided to make a selection from a roster of GS-13 candidates, thereby excluding Ms. Kincaid from consideration."  *Id.* (2d Am. Compl. ¶ 76).  She was notified on November 23, 2015 that she had not been chosen for the job.  *Id.* (2d Am. Compl. ¶ 77).

SAC Hyman selected a GS-13 non-supervisory male agent, Edwin Eubanks, III, for the South Carolina RAC position.  *Id.* (2d Am. Compl. ¶ 78).  Kincaid alleges that she "was far more qualified" than Eubanks, in part because she "had been a highly successful RAC for over three years and was already a Grade 14.  Eubanks, by contrast, had never been a supervisor and had never had a permanent assignment to one of ATF's prestigious offices like IAD."  *Id.* (2d Am. Compl. ¶ 79).

8.     *Involuntary Reassignment*

On November 23, 2015, the OIG published, on its public website, the results of the full investigation it had undertaken concerning Smith's "[o]n-[d]uty [g]ambling and [r]elated [m]isconduct," which stemmed from Kincaid's initial investigation.  *Id.* at 21 (2d Am. Compl. ¶ 80).  Although the report did not identify Smith by name, it did note that its subject was an ATF Special Agent in Charge.  *Id.* (2d Am. Compl. ¶ 82).  Kincaid alleges that it was well known at the ATF that Smith was the agent in question.  *Id.*  Kincaid alleges that Smith "had complained openly about being under this particular investigation" and had "bragged that he had been previously the subject of over twenty IAD investigations and that he had eluded discipline."  *Id.*

Kincaid's husband, Donald Kincaid, is a retired ATF Special Agent in Charge who runs an online listserv sent to "over 800 retired and current ATF employees."  *Id.* (2d Am. Compl. ¶ 83).  Soon after the OIG posted information on the gambling investigation, Donald Kincaid circulated an article about it on this listserv, but did not identify Smith by name.  *Id.* (2d Am. Compl. ¶ 83).  Two individuals subsequently contacted Donald Kincaid, however, and told him that Smith was the subject of the report.  *Id.* at 22 (2d Am. Compl. ¶ 84).  Donald Kincaid then confirmed Smith's identity as the subject of the investigation to the members of the listserv.  *Id.*

The week after Donald Kincaid's emails circulated, Kincaid met with her IAD supervisors, who "inquired whether [she] had discussed the Smith OIG investigation with her husband."  *Id.* (2d Am. Compl. ¶ 87–88).  Kincaid responded "that she had discussed the fact that . . . Smith was one of the individuals she was investigating . . . in the context of sharing her account of the discrimination and retaliation she had faced since first being assigned the preliminary investigation."  *Id.* at 22–23 (2d Am. Compl. ¶ 89).  Indeed, Donald Kincaid had knowledge about Kincaid's investigation into Smith "as a result of having served as her

representative in . . . Kincaid's original administrative EEO complaint, which she commenced in November of 2014." *Id.* at 14–15, 22 (2d Am. Compl. ¶¶ 53, 86).  In the course of their conversation, one of Kincaid's supervisors admitted that it was common knowledge that Smith was the subject of the OIG investigation.  *Id.* at 23 (2d Am. Compl. ¶ 90).

On December 4, 2015, Kincaid was informed "that she was being reassigned involuntarily out of IAD because of the 'optics' created by . . . her husband's identification of . . . Smith by name." *Id.* (2d Am. Compl. ¶ 91).  She was then told that the supervisory RAC position in the ATF office in Columbia, South Carolina, which she had previously sought, was still available and that a supervisor "would support her reassignment to it." *Id.* (2d Am. Compl. ¶ 92).  Kincaid, however, thought that this offer was a "sham" because she believed that a candidate had already been selected for the position.  *Id.* (2d Am. Compl. ¶ 93).  She told the supervisor that she planned to initiate an EEO complaint based on her involuntary reassignment. *Id.*

On December 8, 2015, SAC Murray sent Kincaid a list of GS-14 vacancies, including the Columbia, South Carolina RAC position, and asked her to indicate which ones were of interest to her.  *Id.* (2d Am. Compl. ¶ 94).  Kincaid responded that, "if she had to leave IAD," she preferred the Columbia RAC position.  *Id.* (2d Am. Compl. ¶ 95).  On December 15, 2015, SAC Murray informed Kincaid that "she would [instead] be involuntarily transferred to the Policy Development and Evaluation Branch ("PD&E"), Field Management Staff ("FMS") in ATF Headquarters as a non-supervisory Program Manager." *Id.* at 23–24, (2d Am. Compl. ¶ 96). Kincaid alleges that her reassignment to the Program Manager position constituted "a significant downgrade . . . in terms of her duties, responsibilities, professional exposure, and opportunity for career advancement." *Id.* (2d Am. Compl. ¶ 97).

B.      **Procedural Background**

Kincaid began the EEO process for the second time on December 4, 2015 and filed a

formal administrative complaint on January 19, 2016, alleging that the ATF had discriminated

against her because of her sex and age and had retaliated against her because of her engagement

in protected conduct.  *Id.* at 26 (2d Am. Compl. ¶ 103).  A Report of Investigation into Kincaid's

administrative complaint was completed on October 25, 2016.  *Id.*  Nearly a year later, the

Department of Justice had not taken final action on her administrative complaint, so Kincaid

filed this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  *See id.*; *see*

*also* Dkt. 3 (Compl.); 29 C.F.R. § 1614.407(b) (allowing civil actions when no final action is

taken within 180 days after the EEO complaint is filed).  She filed an amended complaint on

December 13, 2017.  Dkt. 17 (1st Am. Compl.).

On January 2, 2018, Defendants moved to dismiss Kincaid's amended complaint, arguing

that: (1) Kincaid's work on internal IAD investigations did not constitute protected conduct for

purposes of Title VII's anti-retaliation provisions; (2) the actions allegedly taken against Kincaid

were not materially adverse; and (3) the Acting Director of the ATF is not a proper defendant.

Dkt. 24; Dkt. 24-1 at 5.  Kincaid then moved for leave to file a second amended complaint, Dkt.

32, and the Court granted that motion, Minute Order (Apr. 24, 2018); Dkt. 42 (2d Am. Compl.).

Counts I and II of the second amended complaint allege unlawful retaliation: Count I based on

Kincaid's non-selection for the Columbia, South Carolina RAC position, and Count II based on

her involuntary reassignment to the program manager position at FMS.  *See* Dkt. 44-2 at 26–30

(2d Am. Compl.).  Counts III and IV allege unlawful sex discrimination based on the same two

events, respectively.  *Id.* at 30–32 (2d Am. Compl).  Defendants again (1) moved to dismiss

Kincaid's claims against the Acting Director of the ATF on the ground that only the agency

head—here the Attorney General—is a proper defendant in a Title VII action against the government; (2) moved to dismiss Counts I and II on the ground that her work on an internal IAD investigation did not constitute protected activity under Title VII; and (3) moved to dismiss those same counts on the ground that Kincaid has failed to allege sufficient facts to establish a causal link between her participation in the protected activity and any adverse employment action.  Dkt. 45-1 at 5, 18.

## II.  LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief,'" and "then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  "[D]etailed factual allegations," however, are not necessary to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56.

## III.  ANALYSIS

### A.    Claims Against the Acting Director of the ATF

Defendants' first argument—that Kincaid improperly named the Acting Director of the ATF as a defendant—is easily resolved.  As Defendants observe, "the only proper defendant in suits brought under [Title VII] is the head of the department or agency being sued." *Wilson v.*

*U.S. Dep't of Transp.*, 759 F. Supp. 2d 55, 67 (D.D.C. 2011); *see also* 42 U.S.C. § 2000e–16(c);

*Lawson v. Sessions*, 271 F. Supp. 3d 119, 125 n.1 (D.D.C. 2017); *Nurriddin v. Bolden*, 674 F.

Supp. 2d 64, 81 (D.D.C. 2009).  Because the ATF is a sub-agency of the Department of Justice,

the head of the Department of Justice is the proper defendant.  *See Stephenson v. Simon*, 427 F.

Supp. 467, 470–71 (D.D.C. 1976).  Plaintiff does not contest this matter.  *See* Dkt. 48-1 at 34.

The Court will, accordingly, grant Defendant's motion to dismiss the Acting Director.

## B.    Retaliation Claims

Title VII forbids employment discrimination based on "race, color, religion, sex, or

national origin," 42 U.S.C. § 2000e–2(a), and its anti-retaliation provision serves to "prevent[] an

employer from interfering (through retaliation) with an employee's efforts to secure or advance

enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White,* 548

U.S. 53, 63 (2006); 42 U.S.C. § 2000e–3(a).  The anti-retaliation provision has two clauses, the

"opposition clause" and the "participation clause." *Crawford v. Metro. Gov't of Nashville &*

*Davidson Cty., Tenn*., 555 U.S. 271, 274 (2009).  Under the "opposition clause," it is "an

unlawful employment practice for an employer to discriminate against any of his employees . . .

because [the employee] has opposed any practice made an unlawful employment practice by this

subchapter." 42 U.S.C. § 2000e-3(a).  And, under the "participation clause," it is unlawful for an

employer to discriminate against an employee "because [the employee] has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

this subchapter." *Id.*  Here, Kincaid alleges that the ATF retaliated against her in violation of

both clauses on two separate occasions:  (1) in November of 2015, when the ATF did not select

her for a supervisory position in its Columbia, South Carolina field office; and (2) in December

of 2015, when the ATF involuntarily reassigned her from an investigatory position in the IAD to a non-supervisory program manager position in the Policy Development and Evaluation Branch.

In order to establish a prima facie Title VII retaliation claim, a plaintiff must demonstrate three elements: "(1) that [she] engaged in statutorily protected activity; (2) that [she] suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). The ATF's motion to dismiss takes two tracks. First, with respect to Title VII's "opposition clause," the ATF argues that Kincaid's work on an internal IAD investigation did not constitute "protected activity." Dkt. 45-1 at 12–16. Second, with respect to both the "opposition clause" and the "participation clause," it argues that Kincaid has failed to allege facts sufficient to establish a causal link between her protected activity and either her non-selection for the Columbia, South Carolina supervisory position in November 2015 or her reassignment from the IAD to the Policy Development and Evaluation Branch in December 2015. *Id.* at 16–18. Dkt. 45-1 at 8. The Court will consider each argument in turn.

1.    *Protected Activity*

The ATF does not dispute that Kincaid's contact with the EEO office in November 2014 or her stated intention to file an EEO charge in December 2015 constitute protected participatory activity under Title VII. It does argue, however, that Kincaid's work on the IAD investigation of the complaints against Wright and Smith does not qualify as protected oppositional activity. *Id.* at 14–15. In the ATF's view, "Title VII's opposition clause does not cover policy disagreements arising in the course of [investigations into alleged civil rights abuses], and [Kincaid's] retaliation claims founded upon such disagreements therefore fail." *Id.* at 15–16. As explained below, the Court concludes that at least some of Kincaid's conduct in the course of the IAD investigation qualifies as protected oppositional activity.

Title VII's opposition clause prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e–3(a).  The Supreme Court has defined "oppose" by reference to its ordinary meaning: "to resist or antagonize . . .; to contend against; to confront; resist; withstand, . . . to be hostile or adverse to, as in opinion."  *Crawford*, 555 U.S. at 276 (internal citations omitted) (quoting Webster's New International Dictionary 1710 (2d ed. 1957); Random House Dictionary of the English Language 1359 (2d ed. 1987)).  This broad definition led the Court to conclude that the threshold for oppositional conduct is not especially onerous.  Instead, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity."  *Crawford*, 555 U.S. at 276 (internal quotation marks omitted) (citing 2 EEOC Compliance Manual § 8–II–B(1), (2), p. 614:0003 (Mar. 2003)).

The ATF asserts that Kincaid's opposition clause claims fail as a matter of law because "Title VII does not protect [the] pursuit of an internal investigation for IAD."  Dkt. 45-1 at 12.  The basic thrust of the ATF's argument—sometimes referred to as the "manager rule"—is as follows:  when an employee's job duties involve investigating discrimination, fulfillment of those job duties do not constitute protected oppositional activity.  The manager rule, which "stems from case law interpreting the anti-retaliation provisions of the Fair Labor Standards Act . . . and Title VII," dictates that "an employee is not protected from retaliation for reporting concerns about an employer's potential violations of the law, if the employee is acting pursuant to her job duties."  *United States ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp. 3d 143, 153 (D.D.C. 2017) (explaining that "some courts" have adopted such a rule and declining to reach whether it should be applied in the case at bar).  According to the ATF, "[f]ollowing

*Crawford*, courts have held that 'opposition' in the context of Title VII . . . does not include simply conducting an investigation as part of one's job duties."  Dkt. 45-1 at 13.

The case upon which the ATF chiefly relies in arguing that the manager rule applies here, *Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015), actually undercuts its position. As the ATF correctly notes, *Littlejohn* held that "merely reporting or investigating other employees' complaints of discrimination . . . simply fulfills a personnel manager's daily duties," and does not constitute protected oppositional activity.  *Id.*  More generally, *Littlejohn* stands for the following propositions:  First, as the Supreme Court held in *Crawford*, 555 U.S. at 276, the opposition clause protects employees who object to their own unlawful mistreatment *and* employees who object to the unlawful mistreatment of other employees.  *Littlejohn*, 795 F.3d at 317.  Second, "[t]o the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating *by itself* is not a protected activity under [Title VII's] opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII."  *Id.* at 318 (emphasis added).  Third, "if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in a protected activity under [Title VII's] opposition clause."  *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).  Applying this framework, the *Littlejohn* court held that a plaintiff whose job responsibilities involved investigating discrimination but who "repeatedly objected and complained . . . about defendants' [allegedly discriminatory] selection process and failure to abide by proper anti-discrimination policies and procedures" engaged in protected oppositional

activity, because the plaintiff "was not simply conveying others' complaints of discrimination . . . [but, rather,] she was complaining about what she believed was unlawful discrimination in the personnel decision-making process." *Id.* at 318–19.

Along these same lines, the only other case cited by ATF in support of its manager-rule defense—an unpublished district court opinion from outside of this jurisdiction—concludes that "mere investigation of facts and submission of a recommendation as part of a[n] . . . internal investigation would be insufficient to qualify as an activity protected by the opposition clause." *James v. Verizon*, No. CV AW-09-2136, 2010 WL 11545964, at *2 (D. Md. July 26, 2010). That holding is consistent with the reasoning of the *Littlejohn* court: mere fulfillment of one's job duties is not sufficient to constitute oppositional conduct, but active support of another's claim of discrimination or an expressed belief that the employer has engaged in discrimination is.

The problem with the ATF's argument is that it stops at the second proposition announced in *Littlejohn* and ignores the third. But even assuming that the manager rule is controlling, and even assuming that many of Kincaid's actions amounted to nothing more than the reporting of allegations of the complaints of others, the allegations contained in the complaint go well beyond this and aver that Kincaid raised her own complaints about her employer's discriminatory conduct.[2] When her supervisor "actively disparaged" others allegations, Kincaid "expressly objected to [his] mischaracterization." Dkt. 44-2 at 11–12 (2d Am. Compl. ¶ 40). She did not merely provide status updates to her supervisors—rather, when a supervisor claimed

---

[2] Because the ATF's argument fails even on its own terms, the Court need not—and does not—decide whether the manager rule is consistent with Title VII. *But see DeMasters v. Carilion Clinic*, 796 F.3d 409, 422–23 (4th Cir. 2015); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).

that the Title VII violations uncovered by her preliminary report did not warrant further IAD investigation, Kincaid expressed her disagreement. *Id*. at 9–13 (2d Am. Compl. ¶¶ 35–36, 40, 44–45). And she did not merely make herself available to testify, if need be—rather, she proactively and "repeatedly" challenged her supervisor's views by asserting that "if [the employee's] case ever went to court, she would truthfully testify to everything she had learned in the course of her preliminary investigation about [the] violations of Title VII," *id.* at 11–12 (2d Am. Compl. ¶ 40). Stated differently, not only did she vociferously communicate her belief in Quindley's and the other accusers' sex discrimination claims, she also voiced her belief that her supervisors were handling the investigation improperly and in a manner that inadequately addressed findings of discrimination. *See DeMasters v. Carilion Clinic*, 796 F.3d 409, 418–19 (4th Cir. 2015) (considering plaintiff's "shar[ing] his opinion that [the employer] was mishandling the matter . . . with [the employer's] HR manager" to be protected oppositional conduct). Taken together, these allegations, if proved, would show that Kincaid "communicate[d] . . . a belief that [her] employer ha[d] engaged in . . . a form of employment discrimination," which "virtually always constitutes the employee's *opposition* to the activity." *Crawford*, 555 U.S. at 276 (citation omitted).

The ATF argues that Kincaid's allegations nonetheless fail to state a claim under the opposition clause because the allegations "remain[] *related to* . . . Kincaid's job as an internal investigator." Dkt. 45-1 at 15 (emphasis added). But none of the cases the ATF cites— including those that adopt the manager rule in the Title VII context—support such a cramped formulation of oppositional activity. The ATF argues that its view "is supported by the D.C. Circuit's holding in *Morris v. McCarthy*," *id.*, but *Morris* announced no such rule. There, the Court of Appeals held that an employee of an EEO office did not engage in protected

17

oppositional activity by "articulating positions on behalf of [her office] and engaging in debates about equal employment issues." *Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016).  In so doing, the court merely held that the "generalized policy disagreements" at issue there did not constitute protected "oppos[ition to] any discrete practice that [the plaintiff] reasonably could have believed discriminated on the basis of race, color, religion, sex, or national origin." *Id.*  Its analysis turned not on the employee's job duties but, rather, on the generalized nature of her advocacy.  Here, Kincaid's opposition came not in the form of generalized policy disagreements but in the forms of support for specific allegations of sex discrimination and harassment against Wright and Smith and specific objections to the ATF's unsatisfactory pursuit of the investigation.

The Court, accordingly, rejects the ATF's challenges to the sufficiency of Kincaid's alleged oppositional activity.

2.      *Causal Connection*

The ATF also challenges the sufficiency of Kincaid's retaliation claims on the ground that she has not alleged "a causal link" between her protected activity and either her non-selection or involuntary reassignment.  Dkt. 45-1 at 16–17.  The question, then, is whether she has alleged facts that would permit a plausible inference that she was subjected to an adverse action because she engaged in protected EEO activity.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  The Court concludes that she has.

a.      South Carolina RAC position

With respect to her non-selection for the South Carolina RAC position, the ATF first contends that Kincaid "has failed to show that the selecting official for the job in Columbia, South Carolina knew anything about her confidential visit to the EEO office . . . nearly a year before her nonselection."  Dkt. 45-1 at 11 (Mot. to Dismiss).  To prove a retaliation claim, "an

employee must have engaged in protected participation or opposition activity about which the employer knew." *Morris*, 825 F.3d at 673. Even at the summary judgment stage, however, a plaintiff asserting a retaliation claim "needn't provide *direct* evidence that h[er] supervisors knew of h[er] protected activity." *Jones*, 557 F.3d at 679 (emphasis added). Temporal proximity, for example, can at times "support an inference of causation." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007); *see also Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003). Certainly, no more is required at the motion to dismiss stage, at which a plaintiff must simply allege sufficient facts to "raise a right to relief above the speculative level." *Brown v. Sessoms*, 774 F.3d 1016, 1020 (D.C. Cir. 2014) (quoting *Twombly*, 550 U.S. at 555); *see also Williams v. District of Columbia*, 317 F. Supp. 3d 195, 200 (D.D.C. 2018) (noting that, at the motion to dismiss stage, "[the] plaintiff can meet h[is] *prima facie* burden of causation simply by alleging that the adverse actions were caused by his protected activity") (quoting *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268, 279–80 (D.D.C. 2012))).

Kincaid has met her pleading burden. It is plausible that the selecting official, another member of her agency, learned of her 2014 informal EEO complaint given the contentious and high-profile nature of Kincaid's investigation and the selecting official's relationship with Smith. Dkt. 44-2 at 20 (2d Am. Compl. ¶ 75). In evaluating a Rule 12(b)(6) motion to dismiss, the Court must draw all reasonable inferences in favor of the plaintiff. *Devorah v. Royal Bank of Canada*, 115 F. Supp. 3d 35, 38 (D.D.C. 2015). This is not the appropriate time for the Court to consider the parties' factual dispute concerning the degree of confidentiality of Kincaid's EEO complaint. Kincaid claims that she waived confidentiality regarding her 2014 informal EEO complaint, Dkt. 47 at 7, and the ATF counters that, soon after waiving confidentiality, Kincaid

19

"repeatedly directed the EEO office *not* to disclose her November 2014 informal complaint," and points to documents in support of that assertion, Dkt. 51 at 3–4.  But at this juncture, the Court's inquiry focuses solely on the plausibility of Plaintiff's claims based on the allegations in her complaint.  *Watson v. D.C. Water & Sewer Auth.*, 249 F. Supp. 3d 462, 464 (D.D.C. 2017) ("[T]he Court accepts as true the well-pleaded allegations in Plaintiff's Complaint."); *Thomas v. District of Columbia*, 887 F. Supp. 1, 5 n.1 (D.D.C. 1995) ("[T]he Court has discretion not to accept matters outside the pleadings presented by any party in conjunction with a Rule 12(b)(6) motion, particularly where the proffered material and the conversion from a motion to dismiss to one for summary judgment will not facilitate the disposition of the action.").

The ATF also argues that Kincaid has not alleged facts sufficient to show "any connection between her alleged 'oppositional' activity and her nonselection."  Dkt. 45-1 at 16 (Mot. to Dismiss).  The Court disagrees and concludes that Kincaid has alleged facts that could plausibly support the inference that her oppositional activity caused her non-selection.  Kincaid alleges that the selecting official for the position "was . . . a long time professional associate of . . . Smith" and that "it was well-known that . . . Smith was under investigation and that [Plaintiff] had been deeply involved in investigating him."  Dkt. 44-2 at 20 (2d Am. Compl. ¶ 75).  At least at this early stage of the proceeding, one could reasonably infer that the selecting official declined to choose Kincaid for the role in order to punish her for her dogged pursuit of the sex discrimination allegations against Smith and for her support for a continued investigation into his behavior.  In addition, Kincaid alleges that she was far better qualified for the position than the candidate who was hired.  An employer's decision to hire someone markedly less qualified than the plaintiff can serve as evidence that an improper motive such as retaliation

played a role in the hiring decision.  *See Hamilton v. Lew*, 942 F. Supp. 2d 86, 92 (D.D.C. 2013) (discussing qualifications comparisons in retaliation cases).

The ATF seems to argue that, because Kincaid's investigation covered both Title VII and non-Title VII violations, Kincaid's allegations do not support a causal link between protected oppositional activity and her non-selection.  *See* Dkt 45-1 at 17.  "Considering the 'minimal burden' imposed at the prima facie stage," *Hamilton v. Geither*, 666 F.3d at 1359 (quoting *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)), the Court concludes that Kincaid has alleged sufficient facts to establish a plausible link between her oppositional activity and her non-selection for the RAC position, *see Williams*, 317 F. Supp. 3d at 201.

b.    Reassignment from IAD

The ATF also challenges the causation element of Kincaid's claim that she was involuntary reassigned in retaliation for her protected activity on two grounds.  Dkt. 45-1.  The Court is unpersuaded.

First, the ATF again argues that "Kincaid . . . makes no allegations that [the decisonmaking official] . . . was aware of her confidential EEO counseling from over a year earlier."  *Id.* at 17.  That argument fails for the reasons explained above.

Second, the ATF argues that, with respect to Kincaid's stated intention to file an EEO complaint in December of 2015, Kincaid's own timeline cannot support her claim of causation. The ATF asserts that Kincaid herself "acknowledges . . . that she informed her supervisors that she would be initiating the EEO process only *after* they informed her of the reassignment," and thus "cannot claim that the lateral reassignment was retaliation for protected activity that she had yet to undertake at the time the decision to reassign her was made."  *Id.*  Kincaid counters that, even if the ATF planned to reassign her prior to her threat to file an EEO complaint, her supervisors did not select the particular position to which she was reassigned until after she

informed them of her plan to initiate a complaint.  Dkt. 44-2 at 29–30 (2d Am. Compl. ¶¶ 118–21).  She asserts that her assignment to that particular position was retaliatory because the job was far inferior to that of the Columbia RAC position, which she expressed some interest in pursuing.  *Id.* (2d Am. Compl. ¶ 121).

In *Clark County School District v. Breeden*, the Supreme Court held that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  532 U.S. 268, 272 (2001).  That holding does not mean, however, that a company that has already announced that it will be transferring an employee to a different position cannot be liable for retaliation if, upon learning that the employee has filed a charge of discrimination, decides to transfer her to a particularly unattractive position.  The question, which cannot be answered on the present record, is whether the actionable decision—here, for example, the decision to transfer Kincaid to the non-supervisory program manager position with the Policy Development and Evaluation Branch, as opposed to the position as the supervisory Resident Agent in Charge position in Columbia, South Carolina—"*came after* the statutorily protected activity," *Craig v. Lew*, 109 F. Supp. 3d 268, 279 (D.D.C. 2015).

Kincaid has alleged sufficient facts respecting causation to survive the ATF's motion to dismiss.  Upon being informed of her impending reassignment, she was initially informed that the Columbia RAC position was an option, but days after telling her supervisors that she would be filing an EEO complaint, she was assigned to what she alleges was a considerably less desirable position.  And, although she alleges that she "believ[ed]" at that time that the Columbia RAC position had been filled, Dkt. 44-2 at 23 (2d Am. Compl. ¶ 93), she also alleges that she

was subsequently asked to advise her supervisor whether she was interested in that position, and she expressed a continued interest in that position, *id.* (2d Am. Compl. ¶¶ 94–95).  At this stage of the litigation, the Court must credit her allegation that the Program Manager position was a significant downgrade and that the ATF decided not to transfer her to the Columbia RAC position *after* she made known her intent to pursue an EEO complaint.  Accepting the truth of Kincaid's allegations and drawing all reasonable inferences in her favor, that is enough to distinguish this case from *Breeden*.  *See Watson*, 249 F. Supp. 3d at 464 (on considering a motion to dismiss, the Court assumes the truth of a plaintiff's factual allegations).

Finally, the ATF does not contest causation with respect to Kincaid's oppositional activity as it relates to the transfer, and for good reason:  Kincaid has sufficiently alleged that her involuntary reassignment was undertaken in retaliation for her oppositional conduct.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Counts I and II, Dkt. 45, is hereby **DENIED**.  Acting Director Brandon is **DISMISSED** as a defendant.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 30, 2019