# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LISA M. KINCAID,

     *Plaintiff,*

    v.

MERRICK B. GARLAND,
*Attorney General of the United States,*

     *Defendant.*

Civil Action No. 17-1941 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Kincaid was employed as a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF" or the "Bureau") for over thirty years. As relevant here, she was assigned to work as an investigator in the Bureau's Internal Affairs Division ("IAD") between August 2012 and January 2016. In that role, it was Kincaid's job to impartially investigate complaints of administrative or criminal wrongdoing and allegations of discriminatory behavior within the Bureau. Kincaid alleges that following her work on one such investigation—an investigation into allegations made by Special Agent Sherry Ann Quindley against Special Agents Charles Smith and Billy Wright—she was retaliated against in violation of Title VII of the Civil Rights Act. She alleges that she was passed over for a position leading an ATF office in Columbia, South Carolina, transferred out of her prestigious position within IAD, and assigned to a non-supervisory and less desirable role in the ATF's Field Management Services ("FMS"). Kincaid alleges that these adverse personnel decisions were made for two other impermissible reasons: her gender and in retaliation for her own EEO activity.

Kincaid brings this suit under Title VII against the Attorney General of the United States, in his capacity as "head of the department," 42 U.S.C. § 2000e-16(c), which includes the ATF. Defendant (hereinafter "ATF") has moved for summary judgment on all of Kincaid's discrimination and retaliation claims. For the reasons that follow, the Court **GRANTS** in part and **DENIES** in part the ATF's motion for summary judgment.

## I. BACKGROUND

**A.     Factual Background**

For purposes of resolving the motion for summary judgment, the Court takes "the facts in the record and all reasonable inferences derived therefrom in a light most favorable" to the non-moving party. *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)). Understood in that light, the relevant background is as follows.

Lisa Kincaid began working for the Bureau as a special agent in 1987. Dkt. 133-2 at 1 (Def.'s Resp. to Pl.'s SUMF ¶ 3). She was employed by the ATF for the next 32 years. *Id.* (Def.'s Resp. to Pl.'s SUMF ¶ 4). During those decades, Kincaid held a variety of positions: She worked as a group supervisor in the D.C. Arson Task Force, was the Resident Agent in Charge ("RAC") of ATF's Field Office in Pensacola, Florida, and was the Chief of FMS's Case Management Branch. *Id.* at 2 (Def.'s Resp. to Pl.'s SUMF ¶ 6). Kincaid also worked in IAD from February 1993 to November 1998 and, again, from August 2012 until January 2016. *Id.* It was during Kincaid's second tenure at IAD that the events relevant to this case occurred.

1.     *Overview of ATF IAD*

IAD's mission is to "protect the Bureau's credibility and promote[] high standards of professional and personal integrity by conducting thorough, fair investigations of alleged

misconduct and other sensitive matters" involving ATF personnel.  Dkt. 122-2 at 5.  Those

investigations may pertain to "complaints and allegations of administrative or criminal

misconduct or other integrity violations (including sexual harassment or racial discrimination)."

*Id.*  IAD is led by a Special Agent in Charge ("SAC"), and that agent's deputies, known as

Assistant Special Agents in Charge ("ASACs").  *Id.* at 7.  Because IAD is a section within the

Office of Professional Responsibility and Security Operations ("OPRSO"), the IAD SAC reports

to the Assistant Director ("AD") of OPRSO.  *Id.*  The Assistant Director of OPRSO also has at

least one deputy, referred to as the Deputy Assistant Director ("DAD").  *Id.* at 14.

When an allegation that an ATF special agent has engaged in wrongdoing is shared with

IAD, IAD documents that allegation in an incident report.  *Id.* at 7.  The IAD SAC and his

ASACs review the incident report, in conjunction with the OPRSO AD, to determine the

appropriate next step.  *Id.*  Generally speaking, an incident report can result in one of three next

steps.  "If an allegation is determined to warrant no further action by IAD (i.e., it is unfounded,

involves only minor misconduct, or is performance-related), the matter may be closed or referred

to the appropriate management officials" for further action or merely for information.[1]  *Id.* at 7–

8.  In contrast, if IAD determines that the incident "appear[s] to involve employee misconduct or

[is] serious in nature," IAD will open a full "Internal Investigation" into the allegations.  *Id.* at 8.

Finally, if, after a review of the incident report, IAD determines that "sufficient information is

not initially present" to determine which course of the two previous courses of action is most

---

[1] If the referral is "For Action," the manager must report back to IAD regarding the actions
taken.  If the referral is "For Information" only, the manager may determine the appropriate
action to take and need not report back to IAD on what actions were taken, if any. Dkt. 133-3 at
10 (Def.'s Reply to Def.'s SUMF ¶ 16).

appropriate, "IAD may conduct a preliminary inquiry" to gather sufficient facts to make that determination regarding next steps. Dkt. 123-27 at 15.

During a preliminary inquiry or an internal investigation, "it is not the role of Internal Affairs to take a side in the investigations." Dkt. 133-3 at 10 (Def.'s Reply to Def.'s SUMF ¶ 17). Rather, "the role of an Internal Affairs investigator is to gather enough information to prepare a report" that summarizes the findings of the investigation for the relevant decisionmaker. Dkt. 133-3 at 11 (Def.'s Reply to Def.'s SUMF ¶ 18); Dkt. 123-27 at 19. At the conclusion of a full investigation, it is IAD practice to refer a final report to the Professional Review Board ("PRB"). The PRB then "reviews the facts in IAD's report to determine whether misconduct occurred and to propose an appropriate penalty" to the Bureau's Deciding Official ("BDO"). Dkt. 122-2 at 8. The BDO ultimately decides what penalty to impose, if any. *See id.*

A complaint made to IAD may also be investigated by the Department of Justice Office of Inspector General ("OIG"). OIG has a "first right of refusal" to investigate any complaint IAD receives. *Id.* When OIG "adopts" a matter for investigation, IAD as a matter of practice opens an internal investigation to track OIG's investigation. *Id.*

Due to the sensitive "nature of IAD's mission," IAD highly values confidentiality, which it regards as "critical to [its] credibility and effectiveness." Dkt. 122-2 at 5 (emphasis omitted). Accordingly, the IAD Handbook instructs its agents that they "must protect not only the details of investigations but also [IAD's] methodologies, techniques and capabilities." *Id.* Agents are informed that they cannot "discuss the information [they] receive while assigned to IAD, nor the investigative techniques [IAD] use[s], with anyone who does not have a need to know." *Id.* Because "[c]ompromise of this information could damage IAD's reputation, hinder ongoing investigations, and . . . violate the privacy of involved parties," agents are told that "[i]mproper

4

disclosure of such information could result in disciplinary action and removal from IAD." *Id.* In addition, every employee assigned to IAD is required to sign a confidentiality agreement. *Id.*

    2.     *The Quindley Investigation*

On June 19, 2013, Stephen Herkins, the then-DAD of ATF's Office of Field Operations, participated in an Alternative Dispute Resolution ("ADR") session. Dkt. 133-2 at 4 (Def.'s Resp. to Pl.'s SUMF ¶ 16); Dkt. 122-12. The Office of Field Operations manages ATF's agents in the field and is the largest division within ATF. Field Operations has several subdivisions, including FMS and what was referred to at the relevant time as the Special Operations Division ("SOD"). Dkt. 133-2 at 4 (Def.'s Resp. to Pl.'s SUMF ¶ 17).

At the June 19 ADR session, ATF Special Agent Sherry Ann Quindley reported that Billy Wright, the Deputy Chief of SOD, had engaged in sexual harassment. Dkt. 133-3 at 13 (Def.'s Reply to Def.'s SUMF ¶ 32); Dkt. 122-12 at 2. "[D]ue to the nature of the allegations made by Special Agent Quindley," Herkins felt "obligated" to refer her allegations to IAD for further investigation. Dkt. 122-12 at 2. On June 20, 2013, Herkins notified Michael Gleysteen, the OPRSO AD, of Quindley's allegations against Wright. Dkt. 133-3 at 13 (Def.'s Reply to Def.'s SUMF ¶ 29); Dkt. 122-12 at 1. OPRSO AD Gleysteen then forwarded that email to IAD ASAC Daniel Machonis, instructing Machonis to "have the duty agent prepare an IR" or incident report. Dkt. 122-12.

At the time, ASAC Machonis was Kincaid's first-line supervisor. Dkt. 133-3 at 12 (Def.'s Reply to Def.'s SUMF ¶ 21). Machonis gave this assignment Kincaid and directed that she conduct a preliminary investigation into Quindley's allegations. *Id.*; Dkt. 133-3 at 13 (Def.'s Reply to Def.'s SUMF ¶ 32). Due to other investigations that Kincaid was instructed to prioritize, she did not finish her preliminary investigation until the summer of 2014.

As she was concluding her preliminary investigation into Quindley's allegations, Kincaid discussed her view about whether the allegations against Wright had merit with IAD SAC Thomas Chittum. He disagreed with her assessment. Kincaid believed that Quindley's allegations were sufficient to find that Title VII violations had occurred. Dkt. 133-3 at 14 (Def.'s Reply to Def.'s SUMF ¶ 34). Chittum, in contrast, believed that the allegations were a management matter, not suitable for a full investigation by IAD. *Id.* (Def.'s Reply to Def.'s SUMF ¶ 35); *see also* Dkt. 113-4 at 77–81 (Kincaid Dep.).

On August 7, 2014, Kincaid sent her preliminary investigation report to ASAC Machonis. Dkt. 133-2 at 9 (Def.'s Resp. to Pl.'s SUMF ¶ 34). The report was extensive and was not limited to Quindley's allegations against Wright. The report also discussed additional allegations of misconduct against Charles Smith, Chief of SOD and Wright's boss, as well as allegations against other special agents. Dkt. 133-3 at 16 (Def.'s Reply to Def.'s SUMF ¶ 39). On September 2, 2014, Machonis sent the report to IAD SAC Chittum and OPRSO AD Gleysteen for their review and recommended that IAD open a full investigation into the allegations contained in the report. Dkt. 122-4 at 1. Neither recipient viewed Kincaid's report favorably.

Chittum remembers viewing Kincaid's draft report to be "excessive and subjective." Dkt. 123-19 at 3 (Chittum EEO Interrog. ¶ 14). He "thought the report was disorganized and contained a great deal of extraneous and unsubstantiated material." *Id.* Similarly, Gleysteen remembers that Kincaid's report was "one of the lengthiest preliminary investigations" he had read. Dkt. 123-28 at 3 (Gleysteen Interrog. ¶ 15). He testified that he was "frustrated by . . . Kincaid's preliminary investigation because it was unnecessarily delayed in its submission, disjointed, poorly written and contained unsubstantiated conclusions." *Id.*

On September 10, 2014, Gleysteen met with his deputy, DAD Joel Roessner, to discuss Kincaid's report. Dkt. 13-3 at 10 (Def.'s Resp. to Pl.'s SUMF ¶ 39–40). At that meeting, Gleysteen recalls that Roessner was also "disappointed with the overall report quality and [with] Kincaid's apparent lack of objectivity." Dkt. 123-28 at 3 (Gleysteen Interrog. ¶ 15). Roessner then made "a series of verbal and written recommendations to [Gleysteen] to ensure the case was investigated in an unbiased and impartial manner" moving forward. *Id.*; *see also* Dkt. 122-6 at 6–7 (Roessner Interrog. ¶ 19); *id.* at 12 (Attachment to Roessner Interrog.) (recommending that "the preliminary investigation/report stage [be found to be] moot" because "a full investigation both should have been authorized and has in fact been undertaken (but not completed)" and that the "case should be reassigned to at least two experienced and high performing investigators to work on the matter on a full time basis"). One of these recommendations was for investigators to determine "whether identified misconduct issues [were] the subject of EEO process or litigation and [to] resolve any conflicts." Dkt. 122-6 at 12 (Attachment Roessner Interrog.).

On September 16, 2014, IAD SAC Chittum "met with EEO Chief Kim Sanchez" to determine whether Special Agent Quindley had made an EEO complaint and, if so, the status of that proceeding. Dkt. 123-10 at 4. Sanchez informed Chittum that Quindley had, in fact, submitted an EEO complaint and that the issues in the complaint overlapped "almost completely with allegations made to IAD, and include[d] [the] actions of Wright, Smith and [the] others identified." *Id.* Sanchez further informed Chittum that Quindley had "requested a Final Agency Decision" on her complaint and that, if that Wright or others were found to have engaged in disparate treatment or had created a hostile work environment, "EEO would refer the [Final Agency Decision] directly to the PRB for disciplinary action." *Id.*

Following his meeting with Sanchez, Chittum met with Kincaid and IAD ASAC

Machonis on October 3, 2014, to discuss next steps for the Quindley investigation.  Chittum

explained that because Quindley's EEO complaint "substantial[ly] overlap[ed]" with the

allegations in the preliminary report and because Quindley had requested a Final Agency

Decision on her EEO complaint, which "may result in direct referral to PRB for disciplinary

action," Kincaid and Machonis should "hold further investigation of [Quindley's] allegations

regarding hostile work environment or disparate treatment . . . in abeyance."  Dkt. 123-10 at 4.

Regarding the other allegations in Kincaid's report, such as the allegation that Smith had

gambled while on duty, Chittum directed that those allegations be parceled out into new incident

reports for review and investigation as separate matters.  *Id.*

Kincaid recalls that, at the October 3 meeting, she asked Chittum "about the other

women" and what would happen to their allegations.  Dkt. 113-4 at 92 (Kincaid Dep. 92:16–25).

Kincaid further recalls that Chittum responded that they those other women had not filed EEO

complaints and that IAD was "not [going to] open[] a sexual harassment investigation" into those

allegations.  *Id.*  Kincaid remembers her response:

> [W]ell, you know, Sherry Ann Quindley has stated numerous times that if her
> EEO investigation, if she didn't win it, she was going to take her case to court.
> . . . [H]ow is it going to look if she goes to trial, and during discovery they asked
> for a copy of the preliminary investigation report?

Dkt. 113-4 at 92–93 (Kincaid Dep. 92:25–93:5).  When Chittum stated that the draft preliminary

investigation report would not be released, Kincaid recalls that she "argued" and said, "[W]ell, if

that happens, if they go to trial, I will testify to what they have told us."  *Id.* (Kincaid Dep. 93:5–

8).

Kincaid testified that, afterwards, she discussed her frustration with the decision not to

open a full investigation with others in IAD, although she was unable to specify with certainty

when or with whom she had these conversations. *Id.* at 93 (Kincaid Dep. 93:9–25). She stressed, however, that she "did not make it a secret that [she] was unhappy with the pushback she was getting on the case" and that "[a]nybody that was in Internal Affairs at the time would have heard about it." *Id.* at 89–90 (Kincaid Dep. 89:17–90:21).

Following the October 3 meeting with Chittum and Machonis, Kincaid divided the allegations contained in the Quindley preliminary report into separate incident reports. Dkt. 133-2 at 20 (Def.'s Resp. to Pl.'s SUMF ¶ 61); *see also* Dkt 123-10 at 4–5. IAD then opened four non-Title VII misconduct investigations: two investigations into allegations against Wright; one investigation into Smith's alleged on-duty gambling; and one investigation into other management officials. Dkt. 133-3 at 21–22 (Def.'s Reply to Def.'s SUMF ¶ 46).

Kincaid was assigned responsibilities relating to some, but not all, of these four investigations. When DOJ OIG opened its preliminary investigation into Smith's on-duty gambling, Kincaid was assigned to monitor the OIG investigation. *Id.* at 22 (Def.'s Reply to Def.'s SUMF ¶ 47). And on December 23, 2014, Kincaid was also assigned to one of the spin-off investigations into Wright's alleged misconduct. *Id.* (Def.'s Reply to Def.'s SUMF ¶ 48). The remaining two investigations stemming from Kincaid's preliminary report were assigned to two other agents. Dkt. 123-10 at 5; Dkt. 111-10 at 12 (Kincaid Interrog. ¶ 76).[2]

On January 28, 2015, OPRSO AD Gleysteen formally recused himself from the investigations that had spun off from the Quindley preliminary investigation, Dkt. 111-19, because he "became aware that one of the witnesses (Sherry Ann Quindley) had insinuated that

---

[2] In January 2015, IAD opened one additional investigation into allegations against Smith that was unrelated to the Quindley investigation. Dkt. 133-3 at 23 (Def.'s Reply to Def.'s SUMF ¶ 49). Kincaid was assigned to conduct that investigation as well. *Id.*

[he] was biased against her," Dkt. 123-28 at 3.  From that point until Gleysteen left OPRSO in

April 2015, OPRSO DAD Roessner supervised those cases.  *Id.*

    After Gleysteen left OPRSO, he was replaced as AD by Melvin King.  Dkt. 133-3 at 12–

13 (Def.'s Reply to Def.'s SUMF ¶ 29–31).  Kincaid provided King with a revised version of her

preliminary report, and on May 15, 2015, King opened a full investigation into Quindley's

claims of sex discrimination and harassment.  Dkt. 133-2 at 40–41 (Def.'s Resp. to Pl.'s SUMF

¶¶ 145–46).  IAD Special Agent Marcus Watson was assigned to conduct that investigation

instead of Kincaid.  *Id.* at 25 (Def.'s Reply to Def.'s SUMF ¶ 54).

      3.    *Kincaid's Non-Selection for the IAD ASAC Position*

    As Kincaid was finalizing the first draft report for the preliminary Quindley investigation

in the summer of 2014, ATF looked to hire a new ASAC for IAD.  Dkt. 133-2 at 27 (Def.'s

Resp. to Pl.'s SUMF ¶ 92).  Kincaid applied and was one of two finalists for the position.  Dkt.

122-21 at 1.  On September 22, 2014, a Merit Promotion Board ("MPB") convened to determine

who would be hired for the role.  The MPB consisted of four individuals, one of whom was IAD

SAC Chittum, the agency official to whom the new ASAC would report.  Two individuals

initially supported Kincaid's candidacy; while two others, including Chittum, supported the

candidacy of the other individual, Art Peralta.  *Id.* at 1.  At the MPB meeting, Chittum explained

to his fellow panelists his position:

> I have worked with both agents the entire time I've been SAC.  While [Kincaid]
> has a great deal of experience, the "old way" of doing things in [IAD] is not
> necessarily the best.  [The other candidate] was VERY specific in his responses.
> [Kincaid] was too generic in her responses and we could never tell whether she
> specifically was responsible for [the] results.  [The other candidate] in his

materials was very specific on personal results.  He is the most professional, we
give our most complex cases to him.

*Id.* at 1–2.  Chittum's explanation for his vote swayed the other two individuals (because, as the

SAC, he knew the candidate's "work product" and "abilities" and knew "who would serve best

in the role"), and the MPB picked the other candidate for the IAD ASAC position over Kincaid.

*Id.* at 2.

Upon learning that she had not been selected, Kincaid contacted Kim Sanchez, the head

of ATF's EEO office, as well as an EEO counselor, to discuss her interest in filing an EEO

complaint.  Dkt. 133-2 at 28 (Def.'s Resp. to Pl.'s SUMF ¶ 97); Dkt. 122-23; Dkt. 122-24 at 2.

During her exchange with the EEO counselor, Kincaid asked the counselor to keep those

conversations confidential and not to share her interest in filing a complaint outside of the EEO

office.  Dkt. 122-24 at 4.  But when the EEO counselor explained that she needed to interview

the MPB panel members, Kincaid agreed to waive her anonymity for that purpose.  Dkt. 133-2 at

29 (Def.'s Resp. to Pl.'s SUMF ¶¶ 100–01); Dkt. 122-24 at 13; Dkt. 122-25 at 3.

Kincaid initially elected to proceed with her complaint through mediation and appointed

her husband, retired-agent Donald Kincaid, as her representative for the EEO process.  Dkt. 122-

25 at 2.  On January 20, 2015, the EEO counselor emailed Kincaid to inform her that OPRSO

DAD Roessner would be "the management official at the table for the Mediation/ADR session."

Dkt. 122-26 at 2.  Shortly thereafter, Kincaid responded to the email, inquiring whether the EEO

counselor had "notified anyone yet."  *Id.*  Before receiving a response, Kincaid responded to the

EEO counselor's email once more to state:

> I do not believe that having Joel Roessner as the management official involved
> in the mediation will be productive, and I am requesting that you not notify him
> or Michael Gleysteen of my intentions, as I am reconsidering, and may not go

11

forward with the complaint. Please confirm that no notifications have been made at this point.

*Id.* The EEO counselor replied that the EEO Office had "not contacted management." *Id.* at 1. Kincaid then confirmed that she was "not going to go forward at this time" with her complaint. *Id.*

### 4. *Kincaid's Application for the Columbia Field Office RAC Position*

Almost one year after Kincaid was not selected for the IAD ASAC position, ATF posted a job opening for the RAC position within the Columbia, South Carolina Field Office. Dkt. 111-20. The RAC leads the field office and reports to the SAC of the relevant field division. The Columbia office is within the Charlotte Field Division. *Id.*

Kincaid decided to apply for the Columbia RAC position in November 2015. Because the Columbia RAC position was a GS-14 grade position, Kincaid did not need to apply for the position through the MPB process (like she did for the GS-15 IAD ASAC position). Instead, she could apply for a lateral transfer to the role through the noncompetitive reassignment process. Dkt. 133-3 at 26–27 (Def.'s Reply to Def.'s SUMF ¶¶ 59, 61). One other special agent, a male officer named Shawn Arthur, also applied for the Columbia RAC position as a lateral transfer. *Id.* (Def.'s Reply to Def.'s SUMF ¶ 64); *see also* Dkt. 111-21.

Christopher Hyman, the SAC of the Charlotte Field Division, decided to hire neither lateral reassignment candidate. Dkt. 111-7 at 29 (Hyman Dep. 113:11–17). Hyman testified that he rejected both candidates because "the last four supervisors in [the Columbia office], dating back to 1999, had all been lateral transfers, which means that no one in that office in our field division or within ATF at the 13 level had been able to compete for the position." *Id.* at 30 (Hyman Dep. 115:1–13). On November 23, 2015, Kincaid was informed of her non-selection. Dkt. 133-3 at 27 (Def.'s Reply to Def.'s SUMF ¶ 63).

12

After Hyman declined to select either lateral transfer candidate, the position was opened

for competitive promotion of GS-13 candidates through the MPB process. Dkt. 111-7 at 31

(Hyman Dep. 120:5–8); Dkt. 133-3 at 30 (Def.'s Reply to Def.'s SUMF ¶ 76). Edwin Eubanks,

a GS-13 Special Agent, was selected by the MPB for the Columbia RAC position on January 5,

2016. Dkt. 133-3 at 30 (Def.'s Reply to Def.'s SUMF ¶ 77). Hyman recalls that the MPB

selected Eubanks because Eubanks "had a lot of real world experience," such as "setting up [a]

task force, working on [a] task force," and he had "worked in two different ATF offices." Dkt.

111-7 at 32 (Hyman Dep. 122:2–21). Although Hyman recognized that Eubanks had "not [been]

an official supervisor" before, Hyman testified that he found that Eubanks "had worked in a team

environment a lot" and "had been in a leadership position numerous times on task force

investigations." *Id.*

5.   *Kincaid's Transfer Out of IAD*

Around the same time that Kincaid was not selected for the Columbia RAC position,

DOJ OIG published a report that summarized its findings regarding Smith's alleged on-duty

gambling. That report, posted on the OIG website on November 23, 2015, was titled "Findings

Concerning On-Duty Gambling and Related Misconduct by an ATF Special Agent in Charge

While in a Prior Position," and did not name Smith as the subject of investigation. Dkt. 133-3 at

42 (Def.'s Reply to Def.'s SUMF ¶¶ 98–99). Four days later, on November 27, 2015, Kincaid's

husband, retired-agent Donald Kincaid, sent an email to an ATF distribution list that identified

Smith as the subject of the OIG investigation. *Id.* (Def.'s Reply to Def.'s SUMF ¶ 102); *see also*

*id.* (Def.'s Reply to Def.'s SUMF ¶¶ 100–101) (explaining that Donald is a retired ATF special

agent who manages an email distribution list of over 800 retired and current ATF employees

called "ATF Family News").

13

Case 1:17-cv-01941-RDM   Document 160   Filed 10/07/24   Page 14 of 55

Smith forwarded Donald Kincaid's email to Gleysteen, who was now AD of Field

Operations, as well as Wayne Dixie, a DAD within Field Operations, and Melvin King, who had

replaced Gleysteen as AD of OPRSO. Dkt. 123-13 at 1. Smith's email accused Lisa Kincaid of

the following:

> Once again Retired ATF SAC Don Kincaid, OPRSO investigator Lisa Kincaid's
> husband[,] has decided to provide retirees with the information of an ongoing
> investigation. This time he sent information posted on the OIG website and
> identified me as the SAC in question of the allegations. I am convinced that he
> is getting this information from his wife OPRSO Special Agent Lisa Kincaid
> who has *targeted me* along with Special Agent Sherry Ann Quindley *for the past
> two years.*
>
> Lisa has *continued* to abuse her position as an OPRSO investigator by providing
> this and other ongoing investigations initiated by her from information provided
> to her by Agent Quindley to her retired husband for him to post on his website.
> This is wrong as both of them should know that the investigative process has not
> completed and I have not [had] the opportunity to defend myself to the
> allegations I am accused of. . . .

*Id.* at 1–2 (emphasis added). King responded that he would "immediately look into" it, *id.*, and

then instructed his deputy, DAD Daryl McCrary,[3] and IAD SAC Tom Murray[4] to "look into the

matter just to see if there was any truth to it," Dkt. 111-5 at 27 (King Dep. 103:3–5); *id.* at 115–

16 (King Dep. 115:16–116:9).

On December 3, 2015, Kincaid met with Murray and IAD ASAC Francisco Arredondo.[5]

Dkt. 133-3 at 45 (Def.'s Reply to Def.'s SUMF ¶ 106). At that meeting, Murray asked Kincaid

---

[3] McCrary became a DAD of OPRSO in June 2015, after Gleysteen left OPRSO and was
replaced by King. Dkt. 133-3 at 12–13 (Def.'s Reply to Def.'s SUMF ¶ 28).

[4] In October 2014, Chittum left IAD and was replaced by Thomas Murray. Dkt. 133-3 at 12
(Def.'s Reply to Def.'s SUMF ¶¶ 25–27).

[5] IAD ASAC Machonis was replaced by Arthur Peralta in Spring 2015. Dkt. 133-3 at 12 (Def.'s
Reply to Def.'s SUMF ¶¶ 21–23). And in September 2015, Peralta was replaced as ASAC by
Arredondo. *Id.* (Def.'s Reply to Def.'s SUMF ¶ 24).

if she had spoken to her husband about the investigation into the allegations that Smith had gambled while on duty. *Id.* (Def.'s Reply to Def.'s SUMF ¶ 107). Kincaid recalls that she responded by acknowledging that she "had confided in him how [she] had been treated during the Sexual Harassment investigation," but states that she denied knowing "that [her] husband was going to send out the e-mail" and clarified that "he sent the e-mail based on e-mails that he had received, and not based upon our confidential conversations." Dkt. 111-10 at 16 (Kincaid Interrog. ¶ 132). Kincaid also "reminded [Murray and Arredondo] that Smith had been telling others that he was under OIG investigation." *Id.* Kincaid recalls that Arredondo then said that "he had heard about Smith's investigation prior to being assigned to IAD" and "that the information was 'all over the Dallas Field Division.'" *Id.*; Dkt. 120-3 at 17 (Kincaid Decl. ¶ 135). Arredondo, for his part, does not remember making those statement at the December 3 meeting with Kincaid. Dkt. 121-1 at 38 (Arredondo Dep. 38:6–13). But Arredondo did testify that he remembered talking with Murray before the December 3 meeting about the "rumors about . . . Smith being under investigation" and stating something to the effect of "for all we know, Charlie Smith was the one that told somebody about the investigation and it wasn't Ms. Kincaid." *Id.* at 36 (Arredondo Dep. 36:9–19).

The next day, on December 4, 2015, OPRSO DAD McCrary met with IAD SAC Murray and Kincaid about Kincaid's disclosure of confidential information to her husband. Dkt. 133-3 at 47 (Def.'s Reply to Def.'s SUMF ¶ 110). At some point during that meeting (or sometime leading up to it), OPRSO AD King was informed that Kincaid "admitted" that she had released confidential information. Dkt. 111-5 at 38 (King Dep. 146:21). "After her admission to what she had done," King concluded that "she could not longer [stay] in IAD." *Id.* (King Dep.

15

147:13–14).  During the December 4 meeting, McCrary thus advised Kincaid that she would be transferred out of IAD.  Dkt. 133-3 at 47 (Def.'s Reply to Def.'s SUMF ¶ 111).

McCrary also asked Kincaid at that meeting where she wanted to be transferred, since she would be leaving IAD.  Kincaid recalls that McCrary raised the Columbia RAC position, asked if she was still interested in it, and said that he and King "had supported" Kincaid's application for that position.  Dkt. 111-10 at 17 (Kincaid Interrog. ¶ 132).  Kincaid then shared that she had not been selected for the Columbia RAC position and that "if [she] was not wanted for that position, [she] did not want it."  *Id.*  Murray also remembers that, around this time, Kincaid let him know that she intended to file an EEO complaint about her removal from IAD.

Following the December 4 meeting, McCrary emailed Murray a list of open positions, including those that would not require Kincaid to relocate, and he asked Murray to let him know "if SA Kincaid is interested in any of [them]."  Dkt. 111-28 at 2.  Murray then forwarded that list of positions to Kincaid and asked Kincaid to let him know if she was interested in any of those positions.  *Id.* at 1–2.  On December 9, 2015, Kincaid responded to Murray's email to let him know that if she had to leave IAD, she wanted to be reassigned to the Columbia RAC position.  *Id.*; Dkt. 133-3 at 47–48 (Def.'s Reply to Def.'s SUMF ¶ 113).  Murray confirmed receipt of Kincaid's email and let her know that he would "send up" her response.  Dkt. 111-28 at 1.

6. *Kincaid's Transfer to FMS*

King testified that within a week or two of receiving Smith's email about Donald Kincaid's newsletter, he met with Field Operations AD Gleysteen.  Dkt. 121-5 at 106 (King Dep. 106:1–3).  King decided to transfer Kincaid to Field Operations because it was the largest division within ATF and had the most vacancies.  *Id.* at 107 (King Dep. 107:3–9).  Gleysteen, as

16

the leader of that division, was responsible for deciding which position Kincaid would be transferred to within Field Operations. *Id.* at 140 (King Dep. 140:15–18).

Gleysteen testified that King told him that "he wanted Lisa Kincaid removed from Internal Affairs," that he "did not have any location for her," "did not want her associated with OPRSO any further," and wanted her "out . . . as quickly as possible." Dkt. 111-6 at 48 (Gleysteen Dep. 186:22–187:4, 187:21–22). Gleysteen believes that King told him at that time that Kincaid needed to leave IAD "because she had revealed sensitive Internal Affairs information to her husband" and that Kincaid wanted to be transferred to Columbia so she could "retire and play golf for a couple of years and collect a paycheck." *Id.* at 48, 49 (Gleysteen Dep. 187:9–11, 190:7–8).

Gleysteen then asked his staff to determine the status of the Columbia RAC position. As part of that inquiry, Gleysteen "verified that [Kincaid] was recently non-selected for a non-competitive reassignment to the RAC position in Columbia, South Carolina." Dkt. 122-39 at 6. His chief of staff then emailed others to ask that "any decision on the Merit Promotion Board for the RAC Columbia, South Carolina position be stayed," presumably while Gleysteen considered what to do with Kincaid. *Id.* Ultimately, however, Gleysteen decided not to "intercede" in the selection process for the Columbia RAC position and the MPB process went forward. Dkt. 111-6 at 51 (Gleysteen Dep. 198:8–11, 200:18–201:1).

Gleysteen decided to transfer Kincaid to a project manager position within Field Management Staff. He did so because the project manager position "did not change [Kincaid's] grade, her pay, and the position was . . . still in a local commuting area and [thus] would not result in a costly [agency-funded] move." *Id.* (Gleysteen Dep. 201:12–15). Gleysteen also explained that he "weighed . . . the fact that Ms. Kincaid—based on the information provided to

[him] by Melvin King—was leaving IAD under a dark cloud in part for releasing sensitive information." *Id.* (Gleysteen Dep. 201:2–6). And he considered the fact that Kincaid had previously been assigned to FMS and had "done a good job when she was there." *Id.* at 52 (Gleysteen Dep. 202:21–203:2).

On December 15, 2015, Kincaid met with IAD SAC Murray and IAD ASAC Arredondo and was informed that she was being transferred to a program manager position within Field Management Staff. Dkt. 133-3 at 49 (Def.'s Reply to Def.'s SUMF ¶ 117). She was transferred the following month. *Id.* at 5 (Def.'s Reply to Def.'s SUMF ¶ 5).

**B.   Procedural Background**

On December 4, 2015, Kincaid initiated the administrative EEO process, Dkt. 133-3 at 78 (Def.'s Reply to Def.'s SUMF ¶ 150), and on January 19, 2016, she filed her formal complaint, *id.* (Def.'s Reply to Def.'s SUMF ¶ 151). Her EEO complaint alleged that she was subject to sex discrimination and retaliation when she was not selected for the Columbia RAC position and when she was reassigned out of IAD and to FMS. Having received no notice of final agency action for more than a year and a half, Kincaid filed this suit on September 22, 2017.

After discovery, Defendant moved for summary judgment on November 9, 2022. Dkt. 111. Kincaid opposed the motion on February 1, 2023. Dkt. 120. After Defendant replied, Dkt. 134, Kincaid moved for leave to file a sur-reply, Dkt. 139, which the Court granted.

## II.  LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of affecting the outcome of the litigation. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving party. *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Holcomb*, 433 F.3d at 895). "That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor." *Gentry v. McDonough*, 588 F. Supp. 3d 91, 94–95 (D.D.C. 2022) (citing *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987)).

The non-moving party's opposition must consist of more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. "[T]he moving party is entitled to judgment as a matter of law if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'" *Eddington v. U.S.*

*Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (quoting *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020)).  If the non-moving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

## III. ANALYSIS

### A.   Retaliation Claims

Kincaid brings two different sets of retaliation claims against the ATF.  She first claims that she was transferred out of IAD to a less desirable position in FMS in retaliation for her expressing her strong views about Quindley's allegations of a hostile work environment and disparate treatment, and for participating in the EEO counseling process in 2014 regarding her non-selection for the IAD ASAC position.  Second, she claims that she was not selected to lead the Columbia office for the same retaliatory reasons.

To prevail on a retaliation claim, a plaintiff must establish that "she engaged in protected conduct; that her employer took an adverse personnel action; and that 'a causal connection' existed between the two."  *Clayton v. District of Columbia*, 374 F. Supp. 3d 119, 130–31 (D.D.C. 2019) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)).  The ATF argues that Kincaid's claims cannot survive summary judgment because she has not shown that she engaged in protected activity and has not shown that her protected activity was the reason for the adverse employment actions.

As explained below, the Court is unpersuaded by the ATF's arguments with respect to Kincaid's claim that she was transferred out of IAD and to FMS in retaliation for the views that she expressed about the Quindley investigation and for participating in the EEO counseling process in 2014.  But, as to Kincaid's claim that she was not selected for the Columbia RAC position in retaliation for engaging in protected activity, the Court agrees with the ATF that there

is insufficient evidence to permit a reasonable jury to find in Kincaid's favor. The Court will, accordingly, grant in part and deny in part the ATF's motion for summary judgment as to Kincaid's retaliation claims.

> 1.    *Retaliation for the Quindley Investigation*

>> a.    Protected activity

The ATF first argues that Kincaid's claim that she was retaliated against due to the views that she expressed regarding the Quindley investigation fails because her investigatory work was not protected activity. Title VII's "antiretaliation provision . . . prohibits an employer from [retaliating] against an employee . . . because that individual [1] 'opposed any practice' made unlawful by Title VII or [2] 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting § 2000e–3(a)). "These two clauses are known as the 'opposition' clause and the 'participation' clause, respectively." *Egei v. Johnson*, 192 F. Supp. 3d 81, 86 (D.D.C. 2016) (citing *Parker v. Baltimore & O. R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981)). Here, Kincaid does not allege that her work on the Quindley investigation implicated the participation clause. The parties do dispute, however, whether Kincaid's investigatory work (including the views that she expressed regarding Quindley's allegations of sex discrimination) qualifies as protected activity under the opposition clause.

Ordinarily, the opposition clause protects an employee who "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (internal quotation marks and citation omitted) (alteration in original). An employee need not engage in "active, consistent" behavior to engage in oppositional activity. *Id.* at 277. Rather, an

"ostensibly disapproving account of sexually obnoxious behavior toward [the plaintiff or another employee] by a fellow employee" can suffice to trigger the opposition clause's protections. *Id.* at 276; *see id.* (explaining that "oppose" in Title VII carries its "ordinary meaning," that is, "[t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand" (alterations in original)); *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (explaining that there are "no 'magic words'" that make something oppositional, but the complainant must clearly oppose "in some way allege[d] unlawful discrimination").

But there are circumstances in which an employee's communications concerning allegedly discriminatory behavior do not fall within the opposition clause. Some courts outside of this circuit, for example, have recognized a narrow exception to the opposition clause for activities that an employee performs as part of the employee's job duties. Most notably, in *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015), the Second Circuit considered whether the director of a city agency's Equal Employment Office engaged in oppositional activity when she complained to her supervisors about what she viewed as unlawful discrimination in the city government. *Id.* at 318–19. In answering this question, the Second Circuit distinguished (1) "between merely reporting or investigating other employees' complaints of discrimination" when those tasks were part of a "personnel manager's daily duties" and (2) "communicating to the employer the manager's own 'belief that the employer has engaged in . . . a form of employment discrimination.'" *Id.* at 318 (quoting *Crawford*, 555 U.S. at 276) (alteration in original). Under this formulation, simply fulfilling one's job responsibilities by relaying complaints of discrimination to others is not protected activity. But when "an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively 'support[s]' other employees in asserting their Title VII rights or

22

personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in protected activity under § 704(a)'s opposition clause." *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)) (alterations in original). Applying this principle to the facts in that case, the Second Circuit concluded that the plaintiff's activity was protected because she "was not simply conveying others' complaints of discrimination . . . or alerting [her bosses] to Title VII's mandates; she was complaining about what she believed was unlawful discrimination," for example by objecting to "defendants' selection process and failure to abide by proper anti-discrimination policies and procedures." *Id.* at 319, 318.

The ATF asks this Court to embrace the dichotomy recognized in *Littlejohn* but to conclude that, unlike the plaintiff in *Littlejohn*, Kincaid's statements regarding the Quindley investigation fall on the non-protected (non-oppositional) side of the divide. *See* Dkt. 111-1 at 22–25. To engage in oppositional activity, in the ATF's view, Kincaid was required to "communicate[] *her* belief that the allegations she was investigating amounted to employment discrimination in a manner apart from her duties to merely report on and investigate such allegations of misconduct." Dkt. 111-1 at 23 (emphasis in original). On ATF's telling, Kincaid cannot prevail under that standard because the record in this case (in ATF's opinion) "does not establish that Plaintiff did anything more than impartially investigate allegations of employee misconduct in the Smith and Wright Investigations," and thus "her work on those investigations cannot rise to the level of protected oppositional activity." *Id.*

But even if the Court were to apply *Littlejohn*'s standard to the pending motion for summary judgment, ATF's argument would fail. The question before the Court is not whether a reasonable jury could find that Kincaid was merely performing her professional duties in an

impartial manner. The question is whether a reasonable jury could find that she "was complaining about what she believed was unlawful discrimination." *Littlejohn*, 795 F.3d at 318–19. That question, in turn, is easily answered in Kincaid's favor. The evidence in the record is more than sufficient to create a genuine issue of material fact as to whether Kincaid did more than just investigate the accusers' claims and instead expressed her own views about the legitimacy and proper treatment of those claims. *See Crawford*, 555 U.S. at 276 (noting that the plaintiff's description of her coworker's behavior "would certainly qualify in the minds of reasonable jurors as 'resist[ant]' or 'antagoni[stic]'" (alterations in original)); *cf. Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007).

It is ATF policy that "each investigation undertaken [by IAD] will be conducted in a timely, efficient, thorough, and impartial manner." Dkt. 123-27 at 7. "Investigative report findings," such as the preliminary report that Kincaid produced in the fall of 2014, "will be supported by adequate, accurate, and complete documentation . . . and will be free of non-factual opinions, speculation, and personal views." *Id.* The record shows, however, that throughout the period during which Kincaid investigated Quindley's allegations, the ATF agents supervising her at IAD and OPRSO believed that Kincaid did more than act as an impartial investigator, free of all "non-factual opinions" or "personal views." Instead, her supervisors complained that Kincaid had overstepped and, seemingly, had allowed her personal opinions to take hold of her preliminary report.[6]

---

[6] The Court notes that the ATF has failed to provide the Court with a copy of the preliminary report, making it difficult for the Court to form its own conclusions regarding the extent to which the report contains Kincaid's personal views, rather than merely conveying allegations made by others, along with witness statements and other evidence. Because the preliminary report is uniquely in the custody and control of the ATF, any uncertainty about its content cannot work to Kincaid's detriment at this stage of the proceeding.

For example, Chittum, who led IAD during this period, testified that he had misgivings about Kincaid's close relationship with Quindley.  Chittum recalls that "while [he] was in IAD, [he] had concerns that [Kincaid]'s interaction with Sherry Ann Quindley exceeded what was necessary or appropriate given [Kincaid]'s role in IAD" and that as a result, Kincaid "was no longer objective."  Dkt. 123-19 at 4 (Chittum EEO Interrog. ¶ 20).  He remembers Kincaid "occasionally say[ing] things like, 'I feel so much pressure to vindicate these women through [my] investigation.'"  Dkt. 121-2 at 130 (Chittum Dep. 130:18–20).  Indeed, Chittum recalls that he had to remind Kincaid "on multiple occasions" that she needed to "remain[] neutral and objective."  Dkt. 123-19 at 4 (Chittum EEO Interrog. ¶ 20).  Gleysteen, then the leader of OPRSO, echoed Chittum's views in his deposition testimony.  He remembers that "[i]n the back of [his] mind, [he] wonder[ed] if Ms. Quindley . . . didn't basically capture [Kincaid] and win [Kincaid] over to her side where [Kincaid] started acting as Quindley's personal investigator."  Dkt. 111-6 at 25 (Gleysteen Dep. 96:15–20).

These concerns came to a head after Kincaid submitted her draft preliminary report.  That report was reviewed by OPRSO AD Gleysteen, DAD Roessner, and IAD SAC Chittum.  Gleysteen recalls that all three of them viewed Kincaid's report as biased in favor of Quindley's account of the harassment that she had allegedly experienced.  He stated the following:

> I read the preliminary report as I did with all IAD cases. . . .  I was frustrated by Ms. Kincaid's preliminary investigation because it was unnecessarily delayed in its submission, disjointed, poorly written, and contained unsubstantiated conclusions.  Ms. Kincaid failed to adequately check her facts.

> After reading the preliminary report, I provided a copy to OPRSO DAD Roessner and asked him to review it.  Initially, I did not share my thoughts about the preliminary report and asked him for his feedback from his perspective . . . .  Shortly thereafter[,] he returned the document and said that he was disappointed with the overall report quality and Ms. Kincaid's apparent *lack [of] objectivity*.  During our conversation, I believe DAD Roessner also noted the lack of fact checking with Ms. Kincaid's report. . . .  The preliminary case appeared to be

> *heavily weighted against some of the subjects of the case* and Ms. Kincaid's
> report le[d] us to believe that the report was *written in a biased fashion. . . .*
>
> I contacted IAD Special Agent in Charge (SAC) Thomas Chittum. I recall that
> all of us (including SAC Chittum) were of the opinion that the preliminary report
> was poorly written/investigated and that Ms. Kincaid *did not have the
> appearance of objectivity.*

Dkt. 111-12 at 3–4 (Gleysteen EEO Interrog. ¶ 15) (emphasis added); *see also* Dkt. 122-6 at 6,

12 (Roessner EEO Interrog.) (Roessner's contemporaneous notes that described Kincaid's report

as "one-sided" and "rais[ing] questions as to both competence and bias"). Chittum agreed that

Kincaid "presented what she was told as the objective truth when, in fact, [he] thought it was

often *a subjective characterization*;" she "never look[ed] at any allegations with any sort of

skepticism." Dkt. 121-2 at 129 (Chittum Dep. 129:12–15) (emphasis added).

Kincaid herself appears to acknowledge as much at times in her deposition. She

acknowledges that she viewed Quindley and the other accusers' allegations to have merit and

presented that view to her superiors. *See, e.g.*, Dkt. 111-4 at 79 (Kincaid Dep. 79:5–13) ("Well,

the allegations were sexual harassment and creating a hostile work environment. [Chittum]

continuously told me that he did not believe there was any sexual harassment in the case, and

that the hostile work environment was simply Billy [Wright] being an asshole, but that wasn't

against the law. And I told him that I did not agree. . . . [I]f he didn't believe Sherry Ann

Quindley, he needed to read what the other women had to say about what they alleged to have

happened."). She also acknowledges that the preliminary report she submitted was "one-sided"

and that "based on what the victims and witnesses described, [she] believed that there was

enough information to believe that violations of Title VII had occurred." *Id.* at 80 (Kincaid Dep.

80:2–7).

Nor was Kincaid's preliminary report the only example of oppositional activity related to the Quindley investigation that a reasonable jury might credit. At the October 3 meeting, for example, Kincaid told Chittum and Machonis that she would testify on behalf of Quindley if Quindley's EEO claims were dismissed and if Quindley filed suit. Dkt. 111-4 at 92–93 (Kincaid Dep. 92:16–93:8). A few months later, moreover, after Gleysteen, Roessner, and Chittum had all left OPRSO and IAD and had been replaced by King, McCrary, and Murray, Kincaid "did not follow instructions." Dkt. 127-7 at 17 (Kincaid Decl. ¶¶ 140–41). Instead of holding her investigation into Quindley's discrimination claims in abeyance as instructed, Kincaid sent a revised version of the Quindley preliminary report to King in May 2015, and that revised report once again accused Smith and Wright of committing sexual harassment. Dkt. 127-7 at 17 (Kincaid Decl. ¶¶ 140–41); Dkt. 122-7 at 3–14; *cf. Crawford*, 555 U.S. at 277 ("[W]e would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order."); *cf. Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 47 (1st Cir. 2010) ("[E]mployees may communicate their views to their employers through 'purposive conduct.'" (quoting *Crawford.*, 555 U.S. at 853, 855 (Alito, J., concurring))).

Considered together, this evidence is sufficient for a reasonable jury to find that Kincaid engaged in oppositional activity regarding Quindley's allegations—even under the *Littlejohn* standard. The record, when viewed in the light most favorable to Kincaid, shows that at various times during her preliminary investigation, Kincaid's reports and efforts were more akin to advocacy, leaving little doubt with respect to her personal beliefs and opinions: She wrote a report that her superiors viewed as "biased" and that reached conclusions that went beyond the objective facts; she shared her view with her superiors that the allegations in Quindley's

complaint had merit and then repeatedly and emphatically expressed her disagreement when her superiors reached a different conclusion; she threatened to take affirmative steps to further the accusers' claims if the ATF did not pursue those claims internally; and she continued to pursue those claims even after she was instructed to refrain from doing so.

The Court is thus unpersuaded by the ATF's contention that Kincaid's retaliation claim fails at summary judgment on the ground that no reasonable jury could find that she engaged in protected activity relating to the Quindley investigation. *See, e.g., Pippin v. Boulevard Motel Corp.*, 835 F.3d 180, 185–86 (1st Cir. 2016) ("Thus, the record, read in the light most favorable to the plaintiffs, shows that the plaintiffs were fired after continuing to raise concerns about the handling of an investigation into a complaint of sexual harassment that they, along with the victim, had first reported to the employer.  And the record further supports the plaintiffs' claims that they continued to press these concerns even after the employer's investigation had ended and even though they were apparently under no obligation to their employer to do so."); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 420 (4th Cir. 2015) ("[The plaintiff] asserts that he actively and deliberately communicated to [the employer] both [another employee's] complaints and [the plaintiff's] own opinion that these complaints were not properly handled, offered to share ideas about how they could be better handled, and . . . made persistent efforts to help [the employee] initiate [his discrimination] complaint and urge Human Resources to act upon that complaint." (internal quotation marks and citation omitted)).

      b.    Knowledge of Kincaid's protected activity

Switching gears, the ATF next argues that even if some of Kincaid's activities during the Quindley investigation qualify as protected activity, her retaliation claim still fails because there is insufficient evidence that the managers who made the challenged adverse employment

decisions knew about that protected activity. *See Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016) (To succeed on a retaliation claim, a plaintiff must show that she that "engaged in protected participation or opposition activity about which the employer knew."); *Turner v. Shinseki*, 824 F. Supp. 2d 99, 121 (D.D.C. 2011) ("As a matter of law, there can obviously be no retaliation if the [alleged] retaliator did not know about the protected activity." (quoting *Barber v. Am. Sec. Bank*, 655 F. Supp. 775, 779 (D.D.C. 1987))) (alteration in original).  Here, the ATF's argument focuses on two managers:  OPRSO AD King and Field Operations AD Gleysteen.

<strong>i.</strong>

The Court begins with OPRSO AD King.  Kincaid claims that she was removed from IAD by King based on the views that she expressed regarding Quindley's discrimination complaint.  The ATF argues, in response, that this is impossible because King did not know that Kincaid had engaged in protected activity while she was investigating Quindley's complaints.  Although a close question, the Court concludes that a reasonable jury could find that King was aware of Kincaid's protected activity before he removed her from her position at IAD.

King became OPRSO AD in April 2015 and, in that new role, he promptly endeavored to "g[e]t up to speed" on IAD's investigations, especially those investigations involving "senior executive service members in the agency" like Smith. Dkt. 111-5 at 26 (King Dep. 100:6–15). King testified that part of this onboarding process involved being "briefed" on the investigation, *id.*, and although he did not specify who provided this briefing, a reasonable jury could infer that he was briefed by someone who was familiar with the Quindley investigation.  By May 14, 2015, moreover, King had read Kincaid's 2014 preliminary report. Dkt. 111-13 at 3 (King EEOC Interrog. ¶ 19).  He concluded, as his predecessors had, that the 2014 preliminary report "did not

29

follow the standard reporting for a preliminary investigation" because Kincaid did not "simply gather enough information to determine whether or not a full IAD investigation should be opened." *Id.*

Thus, by the time that Kincaid was removed from IAD in November 2015, King would have been aware of the Quindley investigation and familiar with Kincaid's role in it. Dkt. 111-5 at 26 (King Dep. 99:22–101:1). He had read the preliminary report that, for the reasons explained above, itself could be found to have constituted oppositional activity. And he had been briefed by others about the status of the investigation, permitting a reasonable jury to infer that he was told about Kincaid's zealous efforts on Quindley's behalf. Although none of this evidence directly proves that King knew of Kincaid's protected activity, to survive a motion for summary judgment, a plaintiff does not need to offer "direct evidence that [her] supervisors knew of [her] protected activity; [she] need only offer circumstantial evidence that could reasonably support an inference that they did." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009). Kincaid has done so here.

ii.

Kincaid also claims that she was transferred to FMS by Field Operations AD Gleysteen because of the views that she zealously sought to convey in support of Quindley's complaint. The ATF, again, argues that Gleysteen could not have acted with that retaliatory motive because he was unaware of Kincaid's oppositional activity. The Court is unpersuaded. Rather, a reasonable jury could find, based on the evidence currently in the record, that Gleysteen was aware of Kincaid's oppositional activity during the Quindley investigation. After all, Gleysteen himself was present for some of Kincaid's oppositional activity.

Most notably, when he was OPRSO AD, Gleysteen reviewed Kincaid's original preliminary report for the Quindley investigation. He was unhappy with her report because he believed that it contained unsubstantiated facts and biased opinions. Dkt. 111-6 at 42 (Gleysteen Dep. 162:15–163:6). Gleysteen stated that he thought that "Kincaid did not have the appearance of objectivity," Dkt. 111-12 at 4 (Gleysteen EEO Interrog. ¶ 15), and that she had become Quindley's "personal investigator," Dkt. 111-6 at 25 (Gleysteen Dep. 96:18–19). Gleysteen also had several conversations with other managers (Roessner and Chittum) in which his concerns about the purportedly one-sided nature of the preliminary report and Kincaid's purported lack of objectivity were echoed. Dkt. 111-12 at 3–4 (Gleysteen EEO Interrog. ¶ 15); Dkt. 122-6 at 5–6 (Roessner EEO Interrog. ¶ 19).

These interactions are themselves sufficient for a reasonable jury to find that Gleysteen knew that Kincaid had done more than simply investigate Quindley's allegations in her role as IAD investigator and had instead expressed, through her actions and words, her personal opinion that Quindley's allegations about sexual harassment and discrimination had merit and should have received more serious attention than her supervisors thought warranted. Simply put, Gleysteen himself witnessed Kincaid's oppositional activity, and was therefore aware of it.

### iii.

Related to her argument that Gleysteen retaliated against her by transferring her to the FMS position, Kincaid also alleges that Gleysteen could have overridden SAC Hyman's initial decision not to select her for the Columbia RAC position. In Kincaid's view, Gleysteen chose not to override Hyman's decision and instead chose to transfer her to a less attractive FMS position in retaliation for expressing her views about the Quindley investigation. In response, the

ATF argues that Gleysteen did not have the authority to override Hyman's decision and argues that Hyman was at all relevant times the final decisionmaker for the Columbia RAC position.

It bears emphasis that, the Court must view the evidence in the light most favorable to the non-movant, Kincaid, at this stage of the litigation. When the record is viewed in that light, the Court concludes that a reasonable juror could infer that Gleysteen had the authority to override Hyman's decision and could have assigned Kincaid to the Columbia RAC role rather than the less desirable FMS position, notwithstanding Hyman's earlier non-selection decision. *See* Dkt. 122-39 at 6 (Def's Resp. to Pl.'s Interrog. 2) ("Mr. Gleysteen's chief of staff, Mary Warren, asked that any decision on the Merit Promotion Board for the RAC Columbia, South Carolina position be stayed."); Dkt. 111-6 at 52 (Gleysteen Dep. 203:22–204:9) (explaining that he decided not to override Hyman's decision not to select any lateral transfer candidates); Dkt. 111-5 at 37 (King Dep. 144:22–45:4) (characterizing Gleysteen has having the ultimate say over who is assigned to a position in the Field Division). A reasonable jury could, accordingly, consider Gleysteen's decision to assign Kincaid to the FMS position to encompass a separate decision not to override Hyman's decision regarding the Columbia RAC position.

To the extent Kincaid argues, in the alternative, that if Hyman was final decisionmaker for the Columbia RAC position, he too retaliated against her by not selecting her for the Columbia RAC position, the Court agrees with the ATF that the record does not support that claim. In particular, there is no evidence in the record that Hyman knew of Kincaid's oppositional activity during the Quindley investigation. *See* Dkt. 111-7 at 37 (Hyman Dep. 142:1–5). Although Kincaid avers that she "reach[ed] out to SA Christopher Hyman to schedule interviews with some of his staff" during her investigation into Quindley's allegations, Dkt. 127-7 at 13 (Kincaid Decl. ¶ 107), that, at most, supports the inference that Hyman knew that Kincaid

32

was involved in the Quindley investigation. It does not offer a basis for a reasonable jury to infer that he knew of her oppositional activity—that is, that she had done more than merely perform her responsibilities as an IAD investigator and had repeatedly expressed her personal belief that Wright and Smith had engaged in the discriminatory conduct that they were accused of committing. Absent more, there is no basis to find that Hyman retaliated against Kincaid for engaging in protected activity. *See Turner*, 824 F. Supp. 2d at 121.

        c.    <u>Evidence of a retaliatory motive</u>

The ATF's final challenge to Kincaid's Quindley-investigation-based retaliation claim centers on the third element of a retaliation claim: evidence of retaliatory motive. Title VII retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Temporal proximity is one way of proving a nexus between the protected activity and the adverse action, *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012), although it is not the only way. The Court may also evaluate other circumstantial evidence of retaliation under the *McDonnell Douglas* burden shifting framework. *See, e.g., McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012). Under that burden shifting framework, once the plaintiff has established a prima facie case of retaliation, as Kincaid has done here, "the burden . . . shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113–14 (D.C. Cir. 2016). If the employer does so, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence." *Jones*, 557 F.3d at 677 (quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)) (alteration in original).

The ATF argues that no reasonable jury could find that any of the deciding officials (or those who influenced their decisions) acted with retaliatory intent. In the ATF's view, both King and Gleysteen had legitimate nonretaliatory reasons for deciding to transfer Kincaid out of IAD and to FMS, and Kincaid has failed to provide evidence to rebut those explanations. *See Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). Although the facts are disputed, the Court concludes that Kincaid has offered sufficient evidence for a reasonable jury to find that the deciding officials acted with (or were influenced by others who had) the requisite retaliatory motive.

### i.

The Court once again begins with Kincaid's claim that OPRSO AD King removed her from IAD in retaliation for the views that she expressed regarding the Quindley investigation. According to King, he did not transfer Kincaid out of IAD in retaliation but instead because he found that she had broken IAD's confidentiality policy, *see* Dkt. 111-5 at 38 (King Dep. 146:15–147:17). King recalls that Kincaid "admitted" at a meeting he attended along with McCrary and Murray that she had "improper[ly] disclos[ed] . . . information to her husband regarding an ongoing ATF and Office [of] Inspector General investigation in violation of the Internal Affairs Division Handbook and Standard Operating Proceedings, ATF General Orders[,] and signed confidentiality agreement." Dkt. 111-13 at 4 (King Interrog. ¶ 27). As a result of this "admission to what she had done," King concluded that Kincaid "could no longer [stay at] IAD" and decided to transfer her out of her position. Dkt. 111-5 at 38 (King Dep. 147:13–15).

Kincaid responds that this rationale is pretextual and that, regardless of whether she violated the ATF's confidentiality policy, King's decision to transfer her out of IAD was procedurally irregular and thus suspect. Typically, when IAD receives a complaint that an ATF agent has engaged in misconduct, IAD creates an incident report. *See* Dkt. 123-27 at 15. Based

on the information contained in the incident report, IAD will then decide whether a full investigation is warranted, whether the offense was "a minor infraction of Bureau policy" or was "performance-related," or whether additional information is needed before taking any next steps. *Id.* at 9; Dkt. 122-2 at 7–8. If the incident is determined to be a minor infraction or performance related, it is referred to the employee's managers who ordinarily determine what further action to take (if any). Dkt. 122-2 at 13. Kincaid argues that this process was not followed in her case.

Here, the record contains an email from ASAC Arredondo to OPRSO DAD McCrary that explains that IAD had opened an incident report after "IAD was notified of a complaint submitted by ATF Special Agent in Charge (SAC) Charlie Smith" that "refence[d] the possible release of information of investigative details by IAD investigator Lisa Kincaid to her husband Don Kincaid." Dkt. 136-4 at 2. One could reasonably assume that this is a reference to Smith's email to King and Gleysteen on November 30, 2015. Arredondo's email goes on to state that "IAD recommends this [incident report] be forwarded to OPRSO as a management referral for action." *Id.* McCrary responded that he agreed with Arredondo's recommendation. *Id.*

So far, the process described in the email would appear to comport with how IAD describes its processes generally: an ATF employee (Smith) made a complaint to IAD (King) regarding a possible policy violation (disclosure of confidential information) by another ATF employee (Kincaid). An incident report was created upon receipt of that complaint, and it was determined that the appropriate next step was referral to the relevant manager (McCrary) for further action. But Arredondo's email is dated April 1, 2016, and Kincaid was removed from IAD in January 2016. It is thus not possible that Kincaid's removal was a result of the usual IAD disciplinary process; that process was ongoing months after she was purportedly punished for violating the policy. This procedural irregularity, Kincaid argues, shows that she was not

removed from IAD because she had been found to have violated the ATF's confidentiality policy. On her telling, she was instead removed from her position in retaliation for her work on the Quindley investigation.

In support of this view, Kincaid relies, in part, on the temporal proximity between when King received Smith's email and when King decided to remove Kincaid from IAD. King made the latter decision just a few weeks after receiving an email from Smith in which Smith complained that Kincaid and Quindley had been "target[ing]" him for two years and that disclosure to her husband was merely a "continu[ation]" of her abuse of her position at IAD. Dkt. 123-13 at 1; *see Hamilton*, 666 F.3d at 1357 ("[T]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time."). The record also shows that King and Smith been friends for years at the time Smith sent that email. Although Smith acknowledges that their "friendship became strained during that time," Dkt. 121-9 at 119–20 (Smith Dep. 119:10–120:3), both King and Smith testified that they had a personal friendship in November 2015 that continues to this day, Dkt. 111-5 at 11–12 (King Dep. 38:16–42:17) (recalling that King spoke at Smith's retirement party of their multi-year friendship); *cf. Feighan v. Res. Sys. Grp. Inc.*, No. 20-cv-03759, 2023 WL 2707520, at *15 (D.D.C. Mar. 30, 2023) (finding "impractical" a policy that required an employee to report sexual harassment to the CEO when the harassing behavior was at the hands of a "close personal friend[]" of the CEO).

From this evidence, a jury could reasonably infer that Smith's email—in which Smith accused Kincaid of "continu[ing]" to "abuse her position as an OPRSO" agent responsible for investigating the "information provided to her by Agent Quindley," Dkt. 123-13 at 1—referred to Kincaid's assertedly biased conclusions that Quindley's complaints were meritorious. And a jury could infer that Smith sent his email to King with the hope that King, Smith's close friend,

would discourage Kincaid from further advocating on Quindley's behalf and investigating the complaints against him. The speed with which King then decided to remove Kincaid after receiving Smith's email—when combined with the procedural irregularity with which King removed her from position as punishment for violating ATF policy—is sufficient to create a genuine issue of material fact as to whether King removed Kincaid from IAD for retaliatory reasons. This line of reasoning is complicated, of course, by the fact that the same email also accused Kincaid of breaching IAD confidentiality, which formed the basis for the ATF's asserted, nondiscriminatory reason for removing Kincaid from her IAD position. The job of sorting out which of these competing considerations motivated the decision to remove Kincaid from her position, however, is a question for the jury and not the Court.

The Court, accordingly, is unpersuaded that the ATF is entitled to summary judgment on this ground.

### ii.

The Court next turns to Kincaid's claim that Gleysteen chose to transfer her to a less attractive position at FMS in retaliation for her views on the Quindley investigation. Gleysteen testified that he made that decision, not for retaliatory reasons, but for several other reasons: First, Gleysteen explained that he did not consider Kincaid for the Columbia RAC position because he had learned that Hyman had already decided not to accept lateral transfer candidates for the position, and Gleysteen "was not going to intercede in that process." Dkt. 111-6 at 51 (Gleysteen Dep. 200:16–201:1). He instead assigned Kincaid to the FMS program manager because that position "did not change her grade[] [or] her pay, and the position was . . . still in a local commuting area and would not result in a costly [agency-funded] move." *Id.* at 51 (Gleysteen Dep. 201:12–15); Dkt. 107-14 at 6 (Gleysteen EEO Interrog. ¶ 25). He also testified

that he "weighed . . . the fact that Ms. Kincaid . . . was leaving IAD under a dark cloud in part for releasing sensitive IAD information;" he "wasn't going to take somebody who is anything but a stellar employee and move them out into a critical field position where they would be responsible for supervising the men and women out in the field." Dkt. 111-6 at 51, 52 (Gleysteen Dep. 201:2–6, 204:22–205:4). Finally, Gleysteen explained that it was his understanding that "Ms. Kincaid previously had been with Field Management Staff and . . . had done a good job there." *Id.* at 51 (Gleysteen Dep. 201:7–11). Considering these factors together, Gleysteen determined that the program manager position within FMS was the best fit for Kincaid at that time.

Kincaid seeks to undermine the plausibility of this explanation in several ways. First, she points to evidence in the record that seems to contradict Gleysteen's proffered explanation for his decision. She notes that although Gleysteen said that he "was not going to intercede" in Hyman's decision-making process regarding the Columbia RAC position, Dkt. 111-6 at 51 (Gleysteen Dep. 200:22–201:1), Gleysteen's chief of staff, Mary Warren, reached out on his behalf to halt the selection process for the Columbia RAC position while he determined where to assign Kincaid, Dkt. 136-3 at 2; Dkt. 122-39 at 6 (Def's Resp. to Pl.'s Interrog. 2) ("Mr. Gleysteen's chief of staff, Mary Warren, asked that any decision on the Merit Promotion Board for the RAC Columbia, South Carolina position be stayed."). These emails, when viewed most favorably to Kincaid, show that Gleysteen did interfere, albeit only somewhat, in the Columbia RAC selection process by putting the process on hold while he decided what action to take. *See* Dkt. 111-6 at 52 (Gleysteen Dep. 203:22–204:3); Dkt. 111-5 at 37 (King Dep. 144:22–145:4). At a minimum, they suggest that Gleysteen had the authority (or believed he had the authority) to intercede and that he was not wholly unwilling to wield that authority.

Gleysteen also testified that part of his decision to assign Kincaid to the program manager position in FMS, a nonsupervisory position, was because he understood that she was leaving IAD "under a dark cloud." Dkt. 111-6 at 51 (Gleysteen Dep. 200:14–201:11). He elaborated that the "cloud [he] was describing" was the allegation against Kincaid that she had "release[d] information about sensitive IAD matters to someone that does not have a business need, such as a husband or maybe a witness." *Id.* at 52 (Gleysteen Dep. 202:4–8). But the record is ambiguous about how much Gleysteen actually knew at the time about IAD's investigation into Smith's accusation that Kincaid had shared sensitive information with her husband. Gleysteen recalls, although he does qualify that his "recollection . . . could be a bit faulty," that King had told him that he needed to reassign Kincaid "because she had revealed sensitive Internal Affairs information to her husband." *Id.* at 48 (Gleysteen Dep. 187:7–12). King, however, does not remember telling Gleysteen about the specifics for why he decided to remove Kincaid from IAD. He testified that he "didn't really discuss that with [Gleysteen]" and "just told him [that he] needed to move Ms. Kincaid back to field operations." Dkt. 111-5 at 28 (King Dep. 108:22–109:3).[7]

---

[7] Gleysteen instead may have concluded that Kincaid had improperly disclosed confidential information solely from the unsubstantiated allegations contained in Smith's November 27 email, of which Gleysteen was a recipient. But even so, Kincaid argues that Gleysteen had not viewed allegations about the disclosure of confidential IAD information as particularly concerning in the past. For example, one year earlier, when Gleysteen was still leading OPRSO, Gleysteen had met with the Acting Director of ATF regarding the director's concerns that Kincaid was leaking information to a witness, Sherry Ann Quindley, about the investigation. Dkt. 111-6 at 22–23, 24 (Gleysteen Dep. 85:16–87:4, 93:17–20). Gleysteen took no further action on this matter, however, despite his impression that the accusations were credible, although Gleysteen did recuse himself shortly thereafter from the Quindley investigation more generally. *Id.* at 30 (Gleysteen Dep. 116:16–117:12). Finally, to the extent Gleysteen concluded from Smith's email that Kincaid left IAD "under a cloud," a reasonable jury could find (for the reasons explained below) that the "cloud" was her targeting of Smith.

Similarly, Kincaid argues that although Gleysteen emphasized that a local move would be preferable because the Bureau had limited resources with which to move agents, evidence in the record suggests otherwise. *See* Dkt. 111-6 at 51 (Gleysteen Dep. 201:12–15); *id.* at 52 (Gleysteen Dep. 203:13–14, 203:18, 204:4–5) (explaining that "PCS moves cost the bureau quite a bit of money" and ATF "had a limited budget," so "the budgetary aspect of it was a part" of his decision). For example, King testified that there "always was money in the accounts for PCS moves," and "money wasn't an issue" when it came to Kincaid's transfer. Dkt. 111-5 at 37 (King Dep. 145:13–20).

But Kincaid does not only cast doubt on the authenticity of the rationale Gleysteen has provided for his decision. Kincaid also cites to evidence in the record that she contends shows that Gleysteen's true motivation was retaliatory. In this regard, Kincaid first points to the fact that Gleysteen chose to transfer Kincaid, not to her preferred position, but to one she viewed as inferior. More significantly, a few months prior, Gleysteen had served as the OPRSO AD and had viewed Kincaid's advocacy for Quindley with "frustrat[ion]." Dkt. 123-28 at 3 (Gleysteen Interrog. ¶ 15); Dkt. 111-6 at 25 (Gleysteen Dep. 96:8–20). After becoming AD of Field Operations, Gleysteen received an email from Smith that expressed similar frustrations with Kincaid's behavior on the Quindley investigation and accused Kincaid of violating ATF policy. Shortly after receiving that email, Gleysteen then moved Kincaid to a less desirable, non-supervisory role in FMS. Kincaid argues that this sequence of events shows that Gleysteen, after being given the opportunity to retaliate against Kincaid for her work on the Quindley investigation, took that opportunity. On Kincaid's telling, Gleysteen saw Smith's claim that Kincaid had violated ATF policy as the perfect cover to retaliate against Kincaid for actions that had frustrated him for months: her intractable views on the Quindley investigation. *Cf. Kalinoski*

*v. Gutierrez*, 435 F. Supp. 2d 55, 70 (D.D.C. 2006) (explaining that a "wide[r] . . . temporal chasm" can be permissible when the "defendant denied plaintiff the job at the first possible opportunity following her filing of the discrimination claim").

Taken together, this evidence provides sufficient basis for a reasonable jury to doubt the veracity of Gleysteen's explanation for why he decided to transfer Kincaid to the FMS position, *see Geleta v. Gray*, 645 F.3d 408, 414 (D.C. Cir. 2011) ("One way for a plaintiff to show that an adverse employment decision was made for a discriminatory or retaliatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false." (quoting *Czekalski*, 475 F.3d at 366) (cleaned up)), and to conclude, instead, that Gleysteen was motivated to retaliate against Kincaid for her work on the Quindley investigation, *see Jones*, 557 F.3d at 679 (explaining that evidence of a temporal nexus between the protected activity and the adverse action "tends to support a circumstantial inference of retaliation").

The Court is thus unpersuaded by the ATF's arguments as to why Kincaid's claim that she was retaliated against for her work on the Quindley investigation cannot survive summary judgment. Kincaid's claim that both King and Gleysteen retaliated against her by deciding to transfer her out of IAD and to FMS presents questions of material fact for jury to decide.

2.      *Retaliation for Kincaid's EEO Counseling in 2014*

Kincaid further argues that she was subjected to retaliatory discrimination for participating in EEO counseling in 2014 after she was not selected for an open ASAC position within IAD. Recall that after Kincaid was not selected for that position, she contacted the ATF's EEO office to discuss filing a complaint regarding her non-selection. She decided not to proceed with her complaint only after she learned that OPRSO DAD Roessner would serve as the management official at the EEO mediation session. *See Bell v. Gonzales*, 398 F. Supp. 2d 78, 94

(D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination."). Kincaid contends that she (1) was removed from IAD and (2) was transferred to an undesirable FMS because of her receipt of that counseling. ATF moves for summary judgment with respect to both alleged adverse actions. For the reasons that follow, the Court grants the motion with respect to Kincaid's transfer to FMS but denies the motion with respect to Kincaid's removal from IAD.[8]

i.

With respect to Kincaid's contention that Gleysteen transferred her to an undesirable FMS position because of her 2014 EEO activity, Kincaid has failed to proffer evidence sufficient to permit a reasonable jury to find that Gleysteen was aware of this EEO activity. Although Gleysteen served as the OPRSO AD at the time that Kincaid sought EEO counseling in 2014, Gleysteen attests that he was unaware of Kincaid's EEO activity. Dkt. 111-12 at 2 (Gleysteen EEO Interrog. ¶ 8). Kincaid, moreover, testified that she informed only a select few individuals about her intent to pursue EEO counseling; Gleysteen was not one of those individuals. Dkt. 111-4 at 28 (Kincaid Dep. 28:8–12).

Kincaid did testify that she told Art Peralta, the individual who was selected for the ASAC position over Kincaid, of her intention to file an EEO complaint about her non-selection, and she testified that she "suspect[s]" that Peralta informed Gleysteen of her intention to do so. *Id.* at 29 (Kincaid Dep. 29:6–10). But Kincaid's belief is based in no more than her

---

[8] To the extent that Kincaid also claims that Hyman did not select her for the Columbia RAC position because of her 2014 EEO activity, the Court also grants the ATF's motion for summary judgment. The record contains no evidence that Hyman knew of Kincaid's 2014 EEO counseling. Dkt. 111-14 at 2 (Hyman EEO Interrog. ¶ 8); Dkt. 133-3 at 31–32 (Pl.'s Resp. to Def.'s SUMF ¶¶ 80–81).

understanding that Peralta and Gleysteen were friendly and that Gleysteen had encouraged

Peralta to apply for the IAD ASAC position. *Id.* at 29–33 (Kincaid Dep. 29:6–33:4). No

reasonably jury could rely on Kincaid's unsupported speculation to find that, despite Gleysteen's

denial, he in fact knew that she had participated in EEO counseling. *See United States v.*

*Harrington*, 108 F.3d 1460, 1468 (D.C. Cir. 1997) (explaining that "the jury must have had

sufficient evidence" to find the relevant fact "without resorting to excessively strained inferences

or guesswork").

Nor has Kincaid offered any evidence that the confidentiality of the EEO process was

compromised. When OPRSO DAD Roessner was selected as the management official for

Kincaid's mediation, Kincaid asked the EEO counselor to confirm that neither Roessner nor

Gleysteen had been informed that she intended to file a complaint. Dkt. 122-26 at 2. The

counselor responded, stating that the EEO Office had "not contacted management." *Id.* at 1.

Kincaid points to no evidence that would suggest that the EEO counselor's statement was untrue

or incomplete.

Accordingly, the Court concludes that no reasonable jury could find that Gleysteen

assigned her to a less attractive position at FMS in retaliation for her 2014 EEO activity.

**ii.**

The Court reaches a different conclusion, however, with respect to Kincaid's contention

that she was removed from IAD by King in retaliation for her initiation of EEO counseling in

2014. King did not become the OPRSO AD until 2015, after Kincaid had decided not to file a

formal EEO complaint. But during the course of King, McCrary, and Murray's investigation

into whether Kincaid had improperly disclosed confidential information to her husband, Kincaid

asserts that she informed IAD SAC Murray that she had shared confidential, investigatory

information with her husband "in the context of sharing [her] account of the discrimination and retaliation [she] had faced since first being assigned the Preliminary Investigation into sex harassment" and in the context of "seeking his advice about filing an EEO complaint." Dkt. 127-7 at 21 (Kincaid Decl. ¶¶ 171–72). Murray recalls that this interaction took place during his December 4 meeting with Kincaid, Dkt. 121-7 at 164, 165 (Murray Dep. 164:5, 165:18–22), which King remembers attending, Dkt. 111-5 at 38 (King Dep. 146:14–47:19). As a result, there is reason to believe that King knew that Kincaid had engaged in protected EEO activity when he decided to remove her from IAD.

But King's knowledge of Kincaid's 2014 EEO activity is not itself sufficient for this claim to survive summary judgment. Kincaid must also identify sufficient evidence for a reasonable jury to find that King's decision to remove her from her position at IAD was because of her 2014 EEO activity. Kincaid meets this burden—albeit just barely—through the same showing of pretext that the Court has already found sufficient in the context of Kincaid's investigation-based IAD-removal claim, as well as the temporal proximity between when King learned of Kincaid's 2014 EEO counseling and when he decided to remove her.[9] On Kincaid's

---

[9] In discussing the ways in which temporal proximity can be used to show that an adverse action was due to protected activity, courts refer to the relevant period as being the period "between an employer's knowledge of protected activity and an adverse employment action," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (quoting *Clark Cnty.*, 532 U.S. at 273), as well as being the period "between the protected events and the adverse actions," *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007). Other decisions are ambiguous on this score—that is, whether a court should consider whether the adverse action happens shortly after the protected activity or shortly after the employer learns of the protected activity. *See, e.g., Mitchell v. Baldrige*, 759 F.2d 80, 86 n.6 (D.C. Cir. 1985) ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." (citing *McKenna v. Weinberger*, 729 F.2d 783, 791 (D.C. Cir. 1984))); *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *Mitchell*, 759 F.2d at 86); *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009)

telling, King would have learned that Kincaid sought EEO counseling regarding her own claims of retaliation and discrimination nearly contemporaneously with his decision to remove her. *See* Dkt. 127-7 at 21 (Kincaid Decl. ¶¶ 171–72) (describing the relevant events at a meeting on December 3, 2015); Dkt. 121-7 at 164, 165 (Murray Dep. 164:5, 165:18–22) (describing the relevant events at a meeting on December 4, 2015); Dkt. 111-5 at 38 (King Dep. 146:14–47:19) (explaining that he made his final decision to remove Kincaid on December 4, 2015). When considered alongside Kincaid's evidence of pretext, which is discussed above, this evidence of temporal proximity is sufficient to create a triable issue of fact on the question of causation. *See Yazzie v. Nat'l Org. for Women*, No. 19-cv-3845, 2024 WL 230244, at *23 (D.D.C. Jan. 22, 2024).

*   *   *

In sum, the Court will permit three of Kincaid's retaliation claims to go forward. The Court denies summary judgment as to Kincaid's claims that (1) she was removed from IAD in retaliation for (a) her views on the Quindley investigation and/or (b) her receipt of EEO counseling in 2014, and that (2) she was transferred to FMS in retaliation for her views on the Quindley investigation. With respect to Kincaid's other retaliation claims, however, the Court grants the ATF's motion for summary judgment.[10]

---

(quoting *Holcomb*, 557 F.3d at 903). ATF, for its part, expresses no view on the subject. Absent an argument that the Court should adopt the narrower *Mitchell* formulation of temporal proximity, the Court will, for present purposes, consider the evidence under the *Clark County* formulation.

[10] At times, Kincaid also appears to claim that her reassignment to FMS was in retaliation for initiating the EEO process after she was told that she was being removed from IAD. But there is no evidence that Gleysteen, the individual who decided she would be transferred to FMS, knew that she had initiated the EEO process when he made that decision. Although there is evidence that Kincaid told Murray that she would be filing an EEO complaint to challenge her involuntary transfer out of IAD in and around December 4, 2015, Dkt. 111-4 at 132 (Kincaid Dep. 132:15–

**B.    Discrimination Claims**

Finally, the Court turns to the ATF's motion for summary judgment on Kincaid's three

discrimination claims. *See* 42 U.S.C. § 2000e–16 (prohibiting government agencies from

discriminating in employment on the basis of sex).  She alleges, in particular, that she was not

selected to serve as the Columbia RAC, was transferred out of IAD, and was assigned to FMS

because of her sex.  Dkt. 99 at 32–34 (3d Am. Compl. ¶¶ 24–33, ¶¶ 134–40).

Because Kincaid lacks any direct evidence that these personnel decisions were the

product of discriminatory animus, the burden-shifting framework first set out in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies here.  Under that framework, the plaintiff

must first establish a prima facie case of discrimination.  *See Wheeler*, 812 F.3d at 1113–14.  To

do so, she "must allege she is part of a protected class under Title VII, she suffered a cognizable

adverse employment action, and the action gives rise to an inference of discrimination."  *Walker*

*v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).  Once she makes out a prima facie case, "the

burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its

action."  *Wheeler*, 812 F.3d at 1114.  If the employer does so, the burden then shifts back to the

plaintiff, who must demonstrate that the employer's stated reason for its actions was in fact

pretext for unlawful discrimination.  *Walker*, 798 F.3d at 1092.

---

20); Dkt. 121-7 at 164, 165 (Murray Dep. 164:5, 165:18–22), there is no evidence that Kincaid's
remark was ever shared with Gleysteen.  Without some evidence (circumstantial or direct)
suggesting otherwise, it would be pure speculation for a jury to find that King informed
Gleysteen of Kincaid's statement that she was going to file an EEO complaint about her removal
from IAD.  *Cf. Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) ("Given [the employer]'s
denial under oath that he knew of the June 8 EEO complaint, the fact that [the employer] had
been her previous supervisor still requires a speculative leap that her then-current supervisors
would have discussed the complaint with him.").  Accordingly, to the extent Kincaid maintains
that she was assigned to a less desirable position at FMS in retaliation for initiating the EEO
process relating to her removal from IAD, the Court grants summary judgment in favor of the
ATF.

Here, the Defendant provides several nondiscriminatory justifications for all three personnel decisions. With respect to Kincaid's first claim, the ATF explains that Kincaid was not selected for the Columbia RAC position because Hyman wanted to provide a special agent from within the Charlotte Field Division with the opportunity to be promoted. Dkt. 111-7 at 30 (Hyman Dep. 115:1–13). In response to Kincaid's second claim, the ATF posits that King decided to transfer Kincaid out of IAD because he found (and she admitted) that she had improperly released confidential information to her husband. Dkt. 111-5 at 38 (King Dep. 146:15–47:17). As for Kincaid's last claim, the ATF asserts that Gleysteen (1) declined to interfere with Hyman's decision to promote a candidate from within the Charlotte Field Division, and (2) assigned Kincaid to FMS because he believed she was leaving IAD "under a dark cloud" and because the assignment was local and did not involve a change to her grade or pay. Dkt. 111-6 at 51, 52 (Gleysteen Dep. 201:7–15, 204:22–4); Dkt. 107-14 at 6 (Gleysteen EEO Interrog. ¶ 25).

Kincaid does not take issue with the adequacy of the ATF's proffer of these non-discriminatory rationales under *Figueroa v. Pompeo*, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019), although that proffer merely shifts the burden back to Kincaid. The Court must, accordingly, determine whether Kincaid has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). "A plaintiff may support an inference that her employer's stated reasons for undertaking the adverse employment action in question were pretextual by citing a number of possible sources of evidence." *Wheeler*, 812 F.3d at 1115. These include evidence of "the employer's

better treatment of similarly situated employees outside the plaintiff's protected group," "its inconsistent or dishonest explanations," "its deviation from established procedures or criteria," its "pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker*, 798 F.3d at 1092.

Kincaid relies on an assortment of such evidence in an effort to show that a reasonable jury could find that the ATF discriminated against her on the basis of her sex. Because the evidence that she cites falls short of what is needed to create a genuine issue of material fact, the Court grants summary judgment in favor of the ATF on all of Kincaid's sex discrimination claims.

1.    *Hyman's Non-Selection of Kincaid for the Columbia RAC Position*

Kincaid's first discrimination claim asserts that SAC Hyman did not select her for the Columbia RAC position because of her sex. Dkt. 99 at 32 (3d Am. Compl. ¶¶ 124–33). As noted above, there is a genuine dispute as to whether Hyman was the deciding official for the Columbia RAC position or whether Kincaid's non-selection for that position is attributable to Gleysteen. Here, the Court considers whether there is sufficient evidence, assuming Hyman was the deciding official, for a reasonable jury to conclude that Hyman's non-selection decision as to Kincaid was discriminatory.

With respect to that question, Hyman testified that he declined to select Kincaid for that position, not because of her sex, but because he wanted to give GS-13 special agents within the Charlotte Field Division the opportunity to apply for a promotion to the GS-14 RAC position. Dkt. 111-7 at 30 (Hyman Dep. 115:1–13). Kincaid attempts to undermine the credibility of Hyman's nondiscriminatory explanation by arguing that she was substantially more qualified

than the special agent who was hired to be the RAC of the Columbia office, Edwin Eubanks. *See* Dkt. 133-2 at 74 (Def.'s Resp. to Pl.'s SUMF ¶ 279). But Kincaid's argument misses the mark for several reasons.

Ordinarily, a "reasonable jury can infer discrimination where the candidate selected for the position is substantially less qualified than the plaintiff." *Psak v. Bernhardt*, No. 14-116, 2020 WL 2849985, at \*13 (D.D.C. June 1, 2020). In most cases, when an employer does not select the more qualified candidate, "the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc). But here, Hyman's nondiscriminatory rationale explains why he was open to selecting a candidate with less management or other experience—he wanted to provide an opportunity for promotion of a GS-13 within the Charlotte Field Office Division—and Kincaid has failed to identify any evidence casting doubt on the legitimacy of Hyman's rationale. Absent some reason to infer that an employer's asserted criterion for filling a vacant position is discriminatory—or is the proxy for a discriminatory motion—the Court may not second-guess that non-discriminatory criterion. In the words of the D.C. Circuit, "[w]e have consistently declined to serve as a super-personnel department that reexamines an [employer's] business decisions." *Holcomb*, 433 F.3d at 897 (cleaned up).

Kincaid has failed to identify any evidence that would permit a reasonable jury to find that the criterion that Hyman applied in making his selection was either discriminatory or pretextual. And, applying that criterion, Kincaid was less well qualified than the agent who Hyman selected. Although she may have been better qualified using different criteria, the

Court's role ends once it concludes that no reasonable jury could doubt that Hyman actually sought, if possible, to promote a GS-13 from within the Charlotte Field Division. Seen in this light, no reasonable jury could infer, based solely on Kincaid's more extensive experience, that Hyman's decision was discriminatory.

This difficulty with Kincaid's argument is only magnified when one compares her other qualifications to Eubanks's other qualifications. *See* Dkt. 133-2 at 74 (Def.'s Resp. to Pl.'s SUMF ¶ 278). Kincaid does not contend that Eubanks failed to meet the minimum qualifications for the position, Dkt. 111-20, but, instead, argues that based on two criteria—leadership experience and experience working on and leading a task force—she was the superior candidate, Dkt. 133-3 at 30–31 (Pl.'s Resp. to Def.'s SUMF ¶ 78). But, although Kincaid possessed these qualifications, *see, e.g.,* Dkt. 122-42 at 4 (describing Kincaid's experience as the RAC in Pensacola, Florida where she had "initiated the development of an ATF lead violent crime task force"), Eubanks did as well: He had experience leading others and significant work on a task force. Eubanks had served as acting RAC of the Wilmington, North Carolina office on several occasions, including the period when he was applying for the Columbia RAC position. Dkt. 122-43 at 2. He also "led a Heroin and Gun Task Force" in Wilmington that involved multiple agencies, which gave him "the opportunity to conduct and coordinate investigations with local, state and Federal counterparts." *Id.* To successfully defeat a motion for summary judgment based solely on superior credentials—as Kincaid seeks to do here—the gap in qualifications must be significant, since an "employer is more capable of assessing the significance of small differences in the qualifications of the candidates" than is a court, *Aka*, 156 F.3d at 1294. Kincaid falls short of meeting this burden. Although Kincaid could be viewed as the more qualified candidate for the Columbia RAC position based on certain measures, Eubanks was also

well qualified on those same measures, *and* his application carried the additional virtue of coming from a GS-13 within the Charlotte Field Division. "Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)), and, here, there is good reason to believe that Eubanks was—overall—the better qualified candidate.

In the absence of any other evidence of sex discrimination, the purported disparity in qualifications that Kincaid invokes is insufficient to permit a reasonable jury to find that her non-selection for the Columbia RAC position by Hyman was because of her sex.

### 2.    *King's Decision to Transfer Kincaid Out of IAD*

Next, Kincaid argues that King transferred her out of IAD, not because she had breached IAD's confidentiality policy, *see* Dkt. 111-5 at 38 (King Dep. 146:15–47:17), but because she is a woman. In support of this claim, Kincaid again argues, like she did for her retaliation claims, that King's enforcement-of-policy-based explanation for her removal was pretextual.

As explained above, the Court agrees that a reasonable jury might find, based on the procedural irregularity surrounding her removal, that King's stated reasons are suspect. But evidence of pretext *alone* is insufficient to survive a motion for summary judgment on a sex discrimination claim. *See Oliver–Simon v. Nicholson*, 384 F. Supp. 2d 298, 312 (D.D.C. 2005). To be sure, convincing a jury that an employer is lying about why a certain employment decision was made can, at times, support an inference of discriminatory animus. "[W]hen the plaintiff has discredited the employer's explanation for its acts, *and* no other plausible explanation is readily at hand," a jury can "infer the existence of an illegitimate one." *See Aka*, 156 F.3d at 1293 (emphasis added). But this logic applies most forcefully when there is no other, alternative

explanation. Here, however, Kincaid has already identified a plausible, alternative explanation: that King transferred Kincaid in retaliation for her protected activity. Against this backdrop, Kincaid must do more than simply cast doubt on the legitimacy of King's asserted, nondiscriminatory rationale for her transfer; she must also point to *some* evidence that would permit a reasonable jury to infer that her sex was a motivating factor in the adverse employment action. *See Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012). Kincaid tries to fill that gap by arguing that King punished her more severely than other, male special agents—specifically Smith and Wright—for similar or worse offenses.

Better treatment of a similarly situated comparator can be sufficient evidence for a plaintiff to defeat a motion for summary judgment. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). To prove that she is similarly situated to a male employee, a female plaintiff "must demonstrate that she and the alleged similarly-situated employee were charged with offenses of comparable seriousness," *Wheeler*, 812 F.3d at 1115, and "that all of the relevant aspects of her employment situation were nearly identical to those of the male [employee]," *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (internal quotation marks and citation omitted). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015).

Viewed in this light, neither Smith nor Wright is a suitable comparator. ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Both offenses

are unlike Kincaid's offense of sharing confidential information with her spouse. Dkt. 123-23 at 2; Dkt. 122-40 at 2. And Kincaid makes no argument that they are alike in any other respect. Smith, Wright, and Kincaid were employees with different positions and different ranks within the agency: Smith was an SES employee, Wright was a GS-15 employee ███████████ ████████,[11] and Kincaid was a GS-14 employee. Smith and Wright were both employed in Field Operations in managerial roles; Kincaid was an investigator at IAD. Dkt. 123-23 at 1; Dkt. 122-40 at 1. Finally, the officials who decided what punishment to impose were different: King decided to remove Kincaid from her position at IAD; ████████████████████ ███████████████████████████████ ████████████████ Dkt. 133-3 at 77 (Def.'s Reply to Def.'s SUMF ¶¶ 147–49). Based on these differences in offense, job title and rank, and punitive process followed, no reasonable jury could find that Kincaid was similarly situated to Wright or Smith.[12]

Kincaid provides no other reason to infer that King decided to remove her from her position at IAD because of her sex. Accordingly, the Court grants the ATF's motion for summary judgment with respect to this discrimination claim.



3.    *Gleysteen's Decision to Assign Kincaid to FMS*

Kincaid's final claim alleges that Gleysteen assigned her to the program manager position within FMS, not for the reasons he claims, but because of her sex.  Recall that Gleysteen testified that he decided to assign Kincaid to the program manager position because the Columbia RAC position was unavailable, the FMS assignment "did not change her grade, her pay," "the position . . . would not result in a costly [agency-funded] move," Kincaid had previously worked in FMS, and finally that "Kincaid . . . was leaving IAD under a dark cloud in part for releasing sensitive IAD information" Dkt. 111-6 at 51 (Gleysteen Dep. 201:2–15); Dkt. 107-14 at 6 (Gleysteen EEO Interrog. ¶ 25).  To undermine Gleysteen's testimony, Kincaid once again relies on the same evidence that she did in the context of her retaliation claim:  She points out that Gleysteen could have selected her for the Columbia RAC position but chose not to do so; Gleysteen's emphasis on the scarcity of PCS funds was overblown; and Gleysteen might not have known that she had disclosed confidential information to her husband at the time he made the decision to move her to FMS.

Once again, however, providing evidence of pretext itself insufficient.  "The ultimate question is whether the employer intentionally discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000).  To try to show that Gleysteen was motivated by Kincaid's sex when selecting her next position Kincaid argues that two other male employees were treated more favorably when they were transferred to new positions than she was.  But once again, the comparison Kincaid tries to draw is one of apples to oranges (or, more aptly, to lemons).

The first employee she compares her situation to is Shawn Arthur, the other GS-14 special agent who had applied for the Columbia RAC position and was not selected by Hyman.

Following his non-selection, Arthur sought a different position within the Charlotte Field Division.  Several individuals within Field Operations reached out on Arthur's behalf and Hyman approved Arthur's transfer.  *See* Dkt. 133-3 at 69–70 (Pl.'s Resp. to Def.'s SUMF ¶ 138).  But Arthur's transfer was a voluntary one, unlike Kincaid's.  Kincaid also compares herself to ███████████████████████████████████████████████████████████████████ ████████████████████ Dkt. 133-3 at 77 (Pl.'s Resp. to Def.'s SUMF ¶ 148).  Kincaid argues that ████████ too was transferred "under a dark cloud" but was treated more favorably because ███████ ███████████████████████████████████████████████████████████████████ █████████ Once again, the two situations are not comparable.

Other than this comparator evidence, which falls short of what is necessary to survive summary judgment, Kincaid provides no other basis to infer that Gleysteen transferred her to the FMS position because of her sex.  Accordingly, the Court grants summary judgment as to Kincaid's final discrimination claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, Dkt. 111, is hereby **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  October 7, 2024